El Juez Asociado Señor Kolthoff Caraballo
emitió la opinión del Tribunal.
Sabemos que al aplicar el derecho público —y el derecho fiscal es parte del derecho público— hay que tener en mente el interés general, pero parte de ese interés general es hacerle justicia a los ciudadanos. Si *238 no, ¿para qué existen los tribunales y el gobierno en general? La función del gobierno obviamente va más allá de barrer las calles y operar el servicio de la policía. Incluye en grado apreciable el hacer justicia. (Enfasis suplido.)(1)
Reconocida la potestad que tiene el Secretario de Hacienda de imponer y cobrar arbitrios sobre los vehículos de motor que se importan a Puerto Rico, nos corresponde determinar si este funcionario tiene la facultad de cobrar arbitrios por la diferencia que surge entre el “precio sugerido de venta al consumidor” —declarado por el importador al momento del embarque— y el precio en que el concesionario lo vende. De concluir que constituye una imposición de arbitrios no autorizada por ley, debemos examinar si el remedio extraordinario de injunction está disponible para impugnar la actuación del Secretario de Hacienda de negarse a emitir una certificación de pago de arbitrios válida —necesaria para inscribir el vehículo en el Departamento de Transportación y Obras Públicas— hasta que se satisfaga el tributo impuesto ilegalmente.
r—i
El 27 de mayo de 2003, Yiyi Motors, Inc. (Yiyi Motors) presentó en el Tribunal de Primera Instancia una demanda de injunction en contra del Estado Libre Asociado de Puerto Rico (ELA), el Secretario de Hacienda y el Secretario de Transportación y Obras Públicas. Expuso que es un concesionario que adquiere los vehículos de motor marca Nissan de Motorambar, Inc. (Motorambar), y que es éste el importador o el consignatario de esos vehículos en Puerto Rico. En este sentido, adujo que cuando Motoram *239 bar le vende el inventario de vehículos, ya éste ha declarado y satisfecho los arbitrios sobre los vehículos a base del “precio sugerido de venta”, según lo establece el Código de Rentas Internas.(2) Asimismo, como es un concesionario no importador de vehículos, arguyo que únicamente es responsable de presentar en el Departamento de Transportación y Obras Públicas (DTOP) los documentos de la venta al consumidor y la certificación de pago de arbitrios que emita el Departamento de Hacienda como evidencia del pago de los arbitrios realizado por Motorambar, ambos documentos requeridos por el DTOP para la inscripción en el registro de vehículos.
Ahora bien, Yiyi Motors sostuvo que desde noviembre de 2002 el Departamento de Hacienda adoptó un procedimiento de tributación para los vehículos de motor que altera ilegalmente el establecido estatutariamente. El procedimiento al que se refiere el peticionario es el del cobro de los impuestos y la consiguiente expedición de la certificación de pago de arbitrios.
En cuanto al cobro del tributo, Yiyi Motors alegó que la ilegalidad del procedimiento consiste en que el Departamento de Hacienda le exige a los concesionarios que informen el precio en que se le vendió el vehículo al consumidor, y si éste excede del precio de venta sugerido declarado por el importador al embarque del vehículo, le requiere al concesionario que pague arbitrios por la diferencia resultante. Por lo tanto, respecto a la expedición de la certificación de pago de arbitrios, reveló que a pesar de que el importador pague los arbitrios a base del precio sugerido de venta —conforme lo establece la ley— y se proceda con el embarque del vehículo, el Secretario de Hacienda emite la aludida certificación con una expresión que limita, de su faz, la validez de ésta; esto es, en la parte inferior del docu *240 mentó se señala: “ESTA CERTIFICACION NO ES V[Á]LIDA PARA REGISTRAR EL VEH[í]CULO EN EL DEPARTAMENTO DE TRANSPORTACION Y OBRAS P[Ú]BLICAS.”(3)
Como consecuencia de lo anterior, señala el peticionario que la única opción que tiene para eliminar esta restricción es tributar por la diferencia resultante entre el precio sugerido de venta y el precio final de venta —cuando éste sea mayor— lo que constituye el establecimiento de una base contributiva distinta a la dispuesta en el Código de Rentas Internas y, por consiguiente, la imposición ilegal de un arbitrio. Además, advirtió que en la medida en que el Secretario de Hacienda le impone a él como concesionario pagar la “deficiencia contributiva” resultante —sin lo cual no expide una certificación de pago válida— dicho proceder constituye una actuación ilegal y ultra vires por parte de este funcionario, toda vez que el Código de Rentas Internas dispone expresamente que en los casos de artículos importados que estén gravados con el pago de arbitrios, “la persona responsable del pago de los impuestos o contribuyente lo será ... [e]l consignatario, si el artículo viene consignado directamente a un consignatario”.(4)
Como consecuencia de lo anterior, Yiyi Motors solicitó, entre otras cosas, que se le ordenara al Secretario de Hacienda que desistiera de sustituir ilegalmente la base fiscal establecida en el Código de Rentas Internas —el “precio sugerido de venta al consumidor”— para el cálculo de los arbitrios que el importador tiene que pagar al embarque de los vehículos de motor. Además, peticionó que se le ordenara a este funcionario que cesara de cobrarle dichos impuestos como concesionario, en lugar de al importador o *241 consignatario, según dispone el propio Código de Rentas Internas.
De esta forma, fundamentó que procedía el injunction ya que era el mecanismo adecuado para obligar al Secretario de Hacienda a hacer cumplir las disposiciones estatutarias de la tributación de los vehículos de motor, y así garantizar el ejercicio y la continuidad de sus operaciones comerciales. En cuanto a esto último, el peticionario adujo qué las actuaciones ilegales de este funcionario le han causado un daño irreparable toda vez que, entre otras cosas, le impide inscribir en el registro del DTOP los vehículos ya vendidos y entregar a sus clientes el título correspondiente.(5) Por último, sostuvo que para impedir dichos daños y defender sus derechos de la alteración ilegal de la estructura contributiva por parte del Secretario de Hacienda, no existe remedio en ley que lo proteja adecuadamente.
Frente a las alegaciones y argumentaciones del peticionario, compareció el ELA mediante una Moción en Solicitud de Desestimación y/o Sentencia Sumaria. Afirmó que las actuaciones del Secretario de Hacienda eran válidas por ser conforme a Derecho, y que no se cumplía con los requisitos para la expedición del recurso extraordinario de injunction ya que los daños alegados se reducen a un asunto de naturaleza económica susceptible de ser compensado, por lo que no constituye el daño irreparable requerido para que proceda el injunction.
En cuanto a las actuaciones del Secretario de Hacienda, el Estado señaló que éstas eran válidas puesto que para establecer cuál es el “precio sugerido de venta al consumidor” de cada vehículo, el Código de Rentas Internas dis- *242 pone que se tiene que incluir el margen de ganancia para la venta. De esta forma, el recurrido argumentó que a propósito de considerar el margen de ganancia para la venta, es necesario conocer el precio en que se vende el vehículo. Sostuvo que es precisamente por ello que la Exposición de Motivos de la Ley Núm. 80 de 17 de octubre de 1992 —mediante la cual se introdujo la base contributiva del precio sugerido de venta— anunció que el precio sugerido de venta lo establece directamente el importador, pero “en mutuo acuerdo con el concesionario”.
Además, el ELA adujo que de acuerdo con la facultad delegada al Secretario de Hacienda para establecer mediante reglamento las normas necesarias para la aplicación de la Ley Núm. 80, supra, el Departamento de Hacienda adoptó el Reglamento para la Implantación de la Ley Núm. 80 de 17 de octubre de 1992, Reglamento Núm. 5020. Indicó que en éste se dispuso que en caso de que se vendiera un vehículo en exceso del precio sugerido de venta al consumidor, ello se tiene que evidenciar ante la agencia para determinar si el incremento está sujeto al pago de arbitrios adicionales por haber aumentado el mar-gen de ganancia. De esta forma, manifestó que, como constituye una disposición reglamentaria que complementa la Ley Núm. 80, supra, está instituido que la declaración de la venta y el pago por la diferencia en arbitrios es un requisito previo para otorgar una certificación de pago de arbitrios válida para la inscripción en el DTOR
No obstante, aclaró que su contención es que cuando se vende un vehículo a un precio mayor que el sugerido para la venta, según reportado por el importador al embarque, es éste quien está obligado a solicitar a la agencia el cam-bio para efectos del pago de arbitrios. Expresó que para que el importador pueda cumplir con esa obligación, es necesario que el concesionario le informe que la venta al detal del vehículo se va a efectuar por un precio mayor que el reportado como el “precio sugerido de venta al *243 consumidor”. Ahora bien, reveló que es sólo cuando el concesionario incumple su obligación de informar al importador el cambio en el precio sugerido de venta que recae sobre él la obligación de declarar la diferencia y efectuar el pago.
Por último, el Estado alegó que este requerimiento del Secretario de Hacienda no constituye la imposición de un nuevo arbitrio ni una alteración a la base fiscal sobre la cual éstos se calculan, sino que lo que ha hecho es establecer un mecanismo para compeler al cumplimiento de las disposiciones legales vigentes.
Por su parte, Yiyi Motors se opuso a la Moción en Solicitud de Desestimación y/o Sentencia Sumaria presentada por el ELA. En síntesis, reiteró sus planteamientos en cuanto a que la actuación del Secretario de Hacienda funciona como una imposición ilegal de arbitrios e impone su pago al concesionario y no al consignatario, conforme lo establece el Código de Rentas Internas. Señaló que existen discrepancias entre la Ley Núm. 80, supra, y el Reglamento 5020 que redundan en actuaciones para las cuales el Secretario de Hacienda no tiene autoridad. Ilustró lo anterior haciendo aludiendo a la Exposición de Motivos de la Ley Núm. 80, supra, de la cual se desprende que la Asamblea Legislativa procuró que al momento de determinar el precio sugerido de venta de un vehículo no hubiese intervención alguna por parte del Estado. Sobre el particular, advirtió que la ley sí le concede al Secretario de Hacienda la facultad para alterar el precio sugerido de venta y cobrar esa diferencia únicamente al importador, pero tiene que realizarlo previo al embarque del vehículo y en casos particulares, no de forma generalizada; además de que tiene que fundamentarlo en una fuente de información debidamente reconocida en la industria automotriz de Estados Unidos de América.
Trabadas las alegaciones de las partes, el Tribunal de Primera Instancia dictó una sentencia y declaró “sin lugar” *244 la demanda de injunction presentada por Yiyi Motors. Dictaminó que el Secretario de Hacienda no alteró la base contributiva para el cómputo de los arbitrios, por lo que no había usurpado las facultades o las prerrogativas de la Asamblea Legislativa al exigir el pago por la diferencia tributaria que surge cuando un concesionario vende un vehículo a un precio mayor al precio sugerido de venta. Dispuso que ello no podía entenderse como una contribución adicional, sino como una deficiencia contributiva. Ahora bien, concluyó que a Yiyi Motors le asistía la razón en cuanto a que el Secretario de Hacienda no tiene la facultad para imponerle el pago de dicha deficiencia, toda vez que el Código de Rentas Internas dispone que al consignatario le corresponde realizar el pago.
Respecto a la negativa del Secretario de Hacienda de emitir una certificación de pago de arbitrios válida, el foro primario determinó que este funcionario tiene la facultad en ley para requerir que se presente la declaración de venta o cualquier otro documento demostrativo de ésta, y una declaración de arbitrios enmendada, si el precio en que se vendió el vehículo es distinto al precio sugerido de venta al consumidor originalmente reportado por el importador. De esta forma, el tribunal resolvió que el Secretario de Hacienda puede abstenerse de emitir una certificación de pago de arbitrios válida hasta que determine que tras la venta del vehículo no surge ninguna deficiencia contributiva.
Así el dictamen judicial, tanto Yiyi Motors como el Estado presentaron mociones de reconsideración. El foro primario denegó ambas; no obstante, al declarar “sin lugar” la solicitud del ELA hizo constar la expresión siguiente:
El tribunal entiende que el Secretario de Hacienda tiene [la] facultad en ley para requerir a los traficantes de veh[í] culos que informen cualquier cambio en el precio sugerido de venta. Lo que este funcionario no puede hacer es imponerle el pago de la contribución al traficante por estar en conflicto con la *245 sec. 2068(a)(L) del C [ó] digo de Rentas Internas de 1994, 13 L.P.R.A. sec[.] 9068(a)(1).
Debido a que el Estado no recurrió de este dictamen, el hecho de que el contribuyente en el caso de autos es Motorambar y no Yiyi Motors, es un asunto que no está ahora ante nuestra consideración.
Ahora bien, Yiyi Motors presentó un recurso de apelación ante el Tribunal de Apelaciones mediante el cual alegó que incidió el foro primario al resolver que el Secretario de Hacienda tenía la facultad para impedir la inscripción de los vehículos —mediante la emisión de una certificación de pago de arbitrios limitada— cuando el precio en que se venda un vehículo resulta ser mayor que el declarado por el importador como el sugerido para la venta. Más aún, adujo que erró el referido tribunal al concluir que la diferencia que surge entre el precio sugerido de venta y el precio en que se vende el vehículo puede ocasionar una deficiencia contributiva. Por último, solicitó que se revocase la determinación del Tribunal de Primera Instancia de denegar la procedencia del remedio extraordinario de injunction.
Luego de que el Procurador General expuso su posición respecto a los méritos del recurso de apelación presentado por Yiyi Motors, el Tribunal de Apelaciones dictó sentencia mediante la cual confirmó el dictamen del foro primario. Decretó que el Secretario de Hacienda está facultado para exigir los documentos que acrediten la venta del vehículo, con el objetivo de que se solventen los arbitrios aplicables tras la venta, por lo que puede abstenerse de emitir una certificación de pago válida cuando entienda que no se ha satisfecho la totalidad del tributo. De esta forma, concluyó que la actuación de este funcionario no constituye una imposición ilegal de un arbitrio, sino que lo que “persigue [es] *246 velar por el pago pertinente de arbitrios sobre los vehículos en beneficio del fisco”.(6)
Por otro lado, el foro apelativo intermedio encontró adecuado aclarar que el término que define con mayor certeza la discrepancia entre los precios y los arbitrios pagados es el de “insuficiencia de arbitrios”, toda vez que el concepto “deficiencia contributiva” preceptúa un procedimiento distinto que atiende circunstancias particularmente disímiles a las que presenta el caso de autos.(7) En este sentido, dictaminó que el Tribunal de Primera Instancia adjudicó correctamente al determinar que se debe tributar por la diferencia que se genera cuando un vehículo se vende a un precio que excede el sugerido para la venta, pues ello acarrea que no se satisfaga la totalidad de los arbitrios correspondientes, lo que constituye una insuficiencia en su cobro. Por último, sostuvo la determinación apelada en cuanto a que procedía declarar “sin lugar” el injunction ya que los daños alegados son de naturaleza económica y, como tal, son resarcibles y no irreparables.
Inconforme con la sentencia dictada por el Tribunal de Apelaciones, Yiyi Motors acudió ante nos mediante una Petición de certiorari. Señaló que el foro apelativo intermedio erró al no revocar al Tribunal de Primera Instancia toda vez que su sentencia permite que el Secretario de Hacienda: sustituya la base fiscal establecida en el Código de Rentas Internas para cobrar arbitrios a los vehículos importados; requiera sumariamente el pago de contribuciones adicionales fundamentadas en una base contributiva alterna, e impida inscribir los vehículos en el DTOP hasta que no se satisfaga el tributo adicional que surge cuando éstos se vendan por encima del precio sugerido.
El 5 de noviembre de 2004 declaramos “sin lugar” la Petición de Certiorari. No obstante, el 10 de diciembre del mismo año reconsideramos y expedimos el auto solicitado. *247 Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.(8)
II
A. Conforme a nuestro ordenamiento jurídico, la ley es el medio o la fuente legal que establece los límites del poder y de las facultades de las agencias administrativas.(9) Por ello, hemos establecido que “ni la necesidad, ni la utilidad, ni la conveniencia pueden sustituir al estatuto en cuanto a fuente de poder de una agencia administrativa. Es por ello que cualquier duda en cuanto a la existencia de dicho poder dehe resolverse en contra de su ejercicio”. (Enfasis en el original.)(10)
Cuando la Asamblea Legislativa delega afirmativamente determinada función a una agencia, el ente administrativo no puede excederse en su ejercicio de los límites establecidos expresa o implícitamente en el estatuto o por clara implicación de éste.(11) Tampoco la Rama Judicial puede expandir el ámbito de acción que el legislador quiso establecer. Por el contrario, si la actuación de la agencia administrativa excede los poderes delegados por la Rama Legislativa, los tribunales deberán declararla ultra vires y, por ende, nula.(12) Así, pues, cualquier interpretación judicial que avale la transgresión del ámbito del poder delegado a una agencia implicaría que la Rama Judicial usurpa las prerrogativas de la Asamblea Legislativa, lo *248 que tendría el efecto de soslayar los más elementales principios de hermenéutica.(13)
En ocasiones, las agencias transgreden el poder delegado mediante la aprobación de reglamentos que, en vez de implementar la política pública de una ley, la contravienen. Por ello, en nuestra función revisora de reglamentos administrativos, debemos hacer valer el principio elemental de que cuando la legislatura delega en una agencia el poder para promulgar reglamentos, éstos, para ser válidos, no pueden estar en conflicto con las normas establecidas en la ley.(14) De esta forma, un reglamento promulgado para implementar la ejecución de una ley puede complementarla pero no puede estar en conflicto con ésta, pues ello conlleva la sustitución del criterio del legislador por el de la agencia autorizada a reglamentar.(15) “Dicho de otra manera, un reglamento o actuación administrativa claramente en conflicto, o en contra de la ley, es nulo.”(16) Este tipo de disposición reglamentaria tiene que ceder ante el mandato legislativo ya que el texto de una ley jamás debe entenderse modificado o suplantado por el reglamentario, por lo que, de existir cualquier conflicto entre el texto de la ley y su reglamento, debe prevalecer el de la ley.(17)
B. Como es sabido, “[c]uando la ley es clara [y] libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu”.(18) De acuerdo con este mandato, al interpretar un estatuto debemos comenzar remitiéndonos a su texto, pues “[c]uando el legislador se ha manifestado en lenguaje claro e inequí *249 voco, el texto de la ley es la expresión por excelencia de toda intención legislativa”.(19) De esta forma, siendo los términos de un estatuto claros y susceptibles de una interpretación incuestionable —según el significado común de sus palabras y de su construcción gramatical— los tribunales no deben intercalar palabras ni suplir omisiones al interpretarlo.(20) En este sentido, hemos establecido que “[s]i el lenguaje de un estatuto es tan inequívoco que postula un solo significado, un sentido cabal de humildad y autodisciplina judicial requiere la aplicación de la voluntad legislativa”.(21)
No obstante, todas las leyes, aún aquellas cuyo texto catalogamos como “clarísimo”, requieren interpretación.(22) Por esto, como ya expresáramos, en materia de hermenéutica legal “ ‘[s]ólo hay una regla ... que es absolutamente invariable y ésta es que debe descubrirse y hacerse cumplir la verdadera intención y deseo del poder legislativo’ ”.(23) De esta forma, al descargar nuestra función de interpretar una disposición particular de un estatuto, debemos siempre considerar cuáles fueron los principios perseguidos por la Asamblea Legislativa al aprobarla, de manera tal que su interpretación asegure el resultado que originalmente se quiso obtener.(24)
Por último, sobre el particular, nos señalan Bernier y Cuevas Segarra:
Bajo un sistema de separación de poderes como el que fun *250 ciona en Puerto Rico, la Asamblea Legislativa tiene la facultad de aprobar las leyes. El Poder Judicial ejercitado por los tribunales consiste en el ejercicio de las facultades de resolver los litigios a través de la interpretación de la ley. ... Interpretar una ley en forma que sea contraria a la intención del legislador implica la usurpación por la rama judicial de las prerrogativas de la rama legislativa.(25)
C. Con relación a la interpretación de estatutos que imponen contribuciones o impuestos, es un principio cardinal de hermenéutica que éstos no se habrán de interpretar de forma extensiva, sino que se deberán interpretar de una forma justa y conforme a sus propios y expresos términos.(26) “Lo contrario sería sancionar la oprobiosa y opresiva situación conocida históricamente como ‘taxation without representation.’ ”(27) En otras palabras, apartarse de este canon de interpretación restrictiva en aquellas instancias en que el Estado pretende imponerle al ciudadano el cobro de urna contribución, impuesto o arbitrio al margen de los propios y expresos términos de la legislación contributiva concerniente, sería violentar principios básicos o de raíces firmes en la jurisprudencia y en el ordenamiento civil.(28)
Ahora bien, “[n]o debe olvidarse que estas reglas de interpretación estricta deben armonizarse con la otra regla que señala que las leyes que imponen contribuciones deben recibir una interpretación razonable, tendiente a llevar a efecto el propósito y la intención del legislador”.(29) En cambio, cuando el propósito de imponer una contribu *251 ción no es claro, esto es, que no surge claramente de la ley, la duda debe resolverse a favor de su no imposición.(30)
Sobre el particular, citando al Tribunal Supremo de Estados Unidos de América, hemos expresado:
En la interpretación de estatutos que imponen contribuciones, es la práctica establecida no extender sus disposiciones, por implicación, más allá del claro alcance del lenguaje usado, o ampliar su radio de manera que comprenda materias que no han sido específicamente señaladas. En caso de duda, se interpretan estrictamente en contra del Gobierno y a favor del ciudadano.(31)
III
La Ley Núm. 80 de 17 de octubre de 1992, que enmendó la Ley de Arbitrios del Estado Libre Asociado de Puerto Rico de 1987, Ley Núm. 5 de 8 de octubre de 1987, se aprobó para modificar la base contributiva sobre la cual se calculaba el arbitrio de los vehículos que entran a Puerto Rico. La Ley Núm. 80, supra, estableció, entre otras cosas, que el arbitrio a los vehículos nuevos importados se calcularía a base del “precio sugerido de venta al consumidor”, lo que sustituyó el sistema tributario anterior basado en el peso y caballaje de esos vehículos.
Posteriormente, en 1994, y con el propósito de integrar en un solo documento toda la legislación contributiva, la Asamblea Legislativa aprobó el Código de Rentas Internas de 1994, Ley Núm. 120 de 31 de octubre de 1994, el cual derogó cualquier precepto jurídico anterior que contraviniese sus disposiciones. No obstante, en éste se incorporó lo estatuido por la Ley Núm. 80, supra, de tal forma *252 que la definición de lo que constituía el “precio sugerido de venta al consumidor” permaneció prácticamente inalterada. Así, la nueva base contributiva que introdujo la Ley Núm. 80, supra, según la incorporó el Código de Rentas Internas, se definió como sigue:
... En el caso de automóviles nuevos y de vehículos de uso múltiple nuevos, introducidos al país por distribuidores y traficantes autorizados, el precio sugerido de venta al consumidor incluirá el costo básico del modelo del automóvil nuevo y del vehículo de uso múltiple nuevo incluyendo el equipo opcional instalado de fábrica, más el seguro y flete de importación, el margen de ganancia para la venta, y los costos asociados con la preparación y entrega del vehículo.(32)
La definición permaneció inalterada hasta que se aprobó la Ley de la Justicia Contributiva de 2006, Ley Núm. 117 de 4 de julio de 2006, la cual, en lo pertinente, introdujo un cambio poco significativo en la definición de “precio sugerido de venta al consumidor” al incluir la palabra “estimada” con relación al criterio del margen de ganancia, para que lea:
En el caso de automóviles nuevos, introducidos al país por distribuidores y traficantes autorizados, el precio sugerido de venta al consumidor incluirá el costo básico del modelo del automóvil incluyendo el equipo opcional instalado de fábrica, más el seguro y flete de importación, el margen de ganancia estimada para la venta, y los costos asociados con la preparación y entrega del vehículo. (Énfasis suplido.)(33)
A pesar de que el concepto “precio sugerido de venta al consumidor”, como base contributiva, sufrió estas alteraciones, es la Ley Núm. 80, supra, la que aún figura como el *253 estatuto generador de una estructura tributaria mucho más simple que la anterior.(34) Precisamente, fue la incorporación de un criterio uniforme a base del cual calcular los arbitrios de los distintos tipos de automóviles nuevos, lo que inspiró a la Asamblea Legislativa a aprobar la Ley Núm. 80, supra. La claridad meridiana del nuevo método de tributación se desprende del fragmento siguiente de la Exposición de Motivos de la Ley Núm. 80, supra:
El precio se establece directamente por el importador-distribuidor y en mutuo acuerdo con el concesionario vendedor, sin intervención alguna por parte de agentes extra mercado, incluyendo al Estado. Se establece un mecanismo de rotulación único, que no dé lugar a interpretaciones erróneas o arbitrarias que redunde en perjuicio de los consumidores y de los ingresos del [E]stado. Además, al determinarse el monto del impuesto a pagar después de establecido el precio sugerido de venta al consumidor, el sistema propuesto podrá beneficiar a los consumidores ya que el monto del impuesto no formará parte del costo del vendedor sobre el cual se calcula el margen de ganancia. Esta práctica deberá resultar en precios de venta relativamente más bajos para los consumidores.
...El precio sugerido de venta rotulado será el punto de referencia básico para facilitar que el consumidor pueda determinar el vehículo de motor que comprará y el negocio que patrocinará. (Énfasis suplido.)(35)
Ahora bien, para instrumentar la aplicación de la nueva base contributiva, el legislador dispuso los elementos a considerar al determinar cuál es el precio sugerido de venta, así como qué mecanismo tiene disponible el Secretario de Hacienda cuando considere que el “precio sugerido de venta al consumidor” no refleja razonablemente el precio real del vehículo. A esos efectos, la Ley Núm. 80, supra, según la incorporó el Código de Rentas Internas, estatuyó:
*254 (1) Determinación del precio sugerido de venta.—El precio sugerido de venta al consumidor de los automóviles nuevos y usados será determinado por el importador o distribuidor conforme lo dispone esta ley antes de introducir el vehículo a Puerto Rico. Disponiéndose, que el precio sugerido de venta al consumidor, para cada vehículo, no tiene necesariamente que ser igual para todos los concesionarios pero el arbitrio a pagar se determinará y pagará conforme al precio sugerido de venta al consumidor que aparezca en el rótulo de precios adherido al vehículo y determinado por el distribuidor.
(2) Determinación del Secretario si el precio contributivo no refleja razonablemente el precio del vehículo.—En caso de que el precio sugerido de venta al consumidor informado por determinado importador no refleje razonablemente el precio sugerido de venta al consumidor de modelos similares al momento de la introducción del vehículo al país, el Secretario determinará y cobrará a ese importador el impuesto fijado por esta [ley], utilizando como referencia cualquier otra fuente de información que sea debidamente reconocida en la industria automotriz de los Estados Unidos. No obstante, en ningún caso se entenderá que esta facultad autoriza al Secretario a sustituir, como norma de aplicación general, la base del precio sugerido de venta por cualquier otra base fiscal alterna, excepto para corregir el precio contributivo determinado irrazonablemente por el importador en ese caso particular.
La determinación del Secretario se presumirá sin menoscabo de las disposiciones establecidas en [el Subtítulo F]. (Enfasis suplido.)(36)
De las disposiciones legales antes transcritas, puede colegirse que la base contributiva estatuida por la Asamblea Legislativa mediante la aprobación de la Ley Núm. 80, supra —incorporadas posteriormente al Código de Rentas Internas— es el “precio sugerido de venta al consumidor”, el cual será determinado por el importador previo a introdu *255 cir el vehículo a Puerto Rico.(37) No obstante, también se desprende claramente que, en esa etapa, y con el objetivo de evitar el fraude contributivo y obligar al importador a que tribute a base de un precio sugerido de venta que refleje objetivamente el valor del vehículo en el mercado, el Secretario de Hacienda está facultado para indagar sobre la razonabilidad del precio sugerido informado por el importador.
Es precisamente por esa autoridad que el Secretario de Hacienda podrá determinar y cobrar a ese importador el impuesto no satisfecho como parte de un precio sugerido de venta razonable, sujeto esto a los términos en los que el Código de Rentas Internas adoptó tal concepto de la Ley Núm. 80, supra. Claro está, para así proceder tendrá que fundamentar dicha insuficiencia tributaria en alguna fuente debidamente reconocida en la industria automotriz de Estados Unidos de América, puesto que le está vedado alterar el precio sugerido de venta al consumidor por cualquier otra base fiscal alterna.
Ahora bien, a pesar de que los términos utilizados en la redacción de la Ley Núm. 80, supra, son lo suficientemente claros para ser entendidos en un único sentido, resulta indispensable y más que revelador consignar ad verbatim diversos fragmentos del debate en la Cámara de Representantes referentes a la aprobación de la Ley Núm. 80, supra. De esta forma, cumplimos nuestra ineludible función de descubrir y hacer cumplir la verdadera intención y el deseo del poder legislativo al adoptar el “precio sugerido de venta” como base contributiva.
Por esto, el entonces Presidente de la Cámara de Representantes, señor Jarabo Alvarez, expresó:
[Lluego de un diálogo abierto con la industria, todos los sectores de la industria, redactamos el Proyecto 1707. Un Proyecto que establecía, en lugar del “black book”, el precio de *256 venta al consumidor como base para calcular el arbitrio. Era en cierta forma un “sale tax”, un impuesto sobre la venta. En otra forma no lo era, porque como saben los señores legisladores, un impuesto sobre la venta como el que existe en los Estados de la Unión Federada utiliza la venta al consumidor como el evento contributivo; la obligación de pagar contribución, el “sales tax”, surge cuando se vende el artículo al consumidor, y esa base no se podía utilizar en Puerto Rico porque se afectaría el flujo de fondos al Departamento de Hacienda.
Los arbitrios sobre automóviles representan el cuatro por ciento del total de los recaudos, por lo que cualquier sistema diseñado sobre este asunto, por fuerza tiene que garantizar el flujo sostenido de fondos cobrados por arbitrios al Departamento de Hacienda. El Proyecto aprobado con respaldo tripartita en la Cámara tenía la peculiaridad de utilizar como base el precio de venta al consumidor, pero manteniendo el evento contributivo como lo tiene la ley actual, la introducción del carro, o automóvil, al mercado de Puerto Rico. De manera que hacía necesario un sistema de estimado. ¿Estimado de qué? Estimado de cuál iba a ser el precio de venta al consumidor en el momento en que se vendiera el carro. Y eso hacía necesario una contabilidad muy complicada en el Departamento de Hacienda por cada vehículo. Un estimado de cuál iba a ser el precio de venta, un pago o afianzamiento, y luego créditos por lo pagado demás [sic], o reducción y cobro por lo pagado de menos. El Departamento de Hacienda dijo, “No podemos administrar un sistema así, necesitamos un sistema —dijeron— que tenga la certeza, la facilidad, la simpleza, la sencillez, de utilizar el “black book”; ¿el “black book” es inaceptable? Muy bien, inaceptable, pero queremos algo que pueda sustituir el criterio objetivo que nos permita superar la situación actual en que hay que tasar cada vehículo”; y eso, como sabemos todos, sin entrar a discutir los detalles, se presta a mucha irregularidad, a muchas cosas raras, a muchas inequidades, cada vez que se tasa un vehículo para determinar qu[é] arbitrio debe pagar.
Así las cosas, hemos preparado este Sustitutivo del Proyecto 1707, que utiliza el precio de venta sugerido. Fíjense que es lo más que se acerca al precio de venta al consumidor, el precio de venta al consumidor sugerido por el fabricante o por el importador al momento de la introducción del carro en Puerto Rico. O sea, cuando ocurre el evento contributivo, cuando surge la obligación de pagar un arbitrio —igual que ahora—, en lugar de usar la cifra esa elástica, misteriosa, desconfiable, el FOB [entiéndase, el free on board,] va a utilizar el cálculo de cuál *257 será el precio de venta al consumidor, que incluye todos los costos, incluyendo las ganancias del importador y el concesionario, si hay un concesionario distinto al importador. Y ese precio será rotulado y puesto en el cristal del vehículo, de manera que el consumidor vea sobre qué cantidad es que está pagando.
Eso permite una certeza que evita las lagunas y los huecos que tiene la actual ley, y que la hacen vulnerable al fraude. A la misma vez, crea una dinámica de las fuerzas del mercado que obligan a ese fabricante a decir la verdad, porque si trata de subvaluar [sic] ese precio sugerido se va a afectar en su relación con el concesionario. Y si lo exagerara, que sería absurdo, pagaría más arbitrios de lo que le corresponde pagar, y también se afectaría en su relación con el concesionario. De manera que la garantía de que se va a decir la verdad ahí, está no sólo en las penalidades contributivas por cometer fraude —porque eso es fraude—, sino también en las fuerzas naturales de la competencia económica que promueven que verdaderamente se identifique el precio sugerido como el precio real al que se espera que se venda ese vehículo.
Creo ... que he cubierto ... adecuadamente la intención legislativa de esta medida y los aspectos más fundamentales de la misma.(38)
De los fragmentos transcritos se infiere claramente que con la aprobación de la Ley Núm. 80, supra, el legislador precisamente pretendió que no se utilizara la venta del vehículo al consumidor como el evento contributivo, pues ello equivalía a la imposición de un impuesto a la venta que, como base contributiva, no se podría utilizar en Puerto Rico porque afectaría el flujo de fondos al propio Departamento de Hacienda. Como vemos, el proyecto de ley que se convirtió en la Ley Núm. 80, supra, sustituyó otro proyecto de ley que, en esencia, proponía implantar el sistema tributario que instituyó el Secretario de Hacienda; esto es, utilizar como el evento contributivo la introducción del vehículo al mercado de Puerto Rico, pero empleando el *258 precio de venta final al consumidor como la base contributiva.
Según lo concibió el legislador, ese sistema de imposición de arbitrios, al carecer de correlación temporal, implica una contabilidad muy complicada en el Departamento de Hacienda. Requiere que se paguen las contribuciones al momento de la introducción del vehículo a base de un estimado de cuál va a ser el precio de venta al consumidor, para luego, después que el concesionario realice la venta, evaluar y calcular la diferencia que surge entre el estimado y la venta final. Calculada la diferencia, le corresponde al Secretario de Hacienda computar los arbitrios sobrevenidos para entonces imponerle al importador que los pague.
Sin embargo, se desprende del debate parlamentario que fue la propia agencia la que instó al legislador a no aprobar tal estructura contributiva, sino que abogó por una que contuviera un criterio objetivo como el del “black book”, y así dejar a un lado el criterio incierto de la venta final de cada vehículo. Ello así, puesto que además de que constituía un engorroso sistema tributario, resultaba ser perjudicial para cada consumidor puertorriqueño que adquiriera un automóvil nuevo de un concesionario que no importaba vehículos, ya que no podría inscribirlo en el DTOP hasta tanto el importador, con quien no mantuvo ninguna relación comercial, gestionara el pago de dichos arbitrios sobrevenidos.
IV
La Ley Núm. 80, supra, facultó al Secretario de Hacienda para que reglamentara las normas necesarias para su aplicación. Así, el 18 de enero de 1994, la agencia aprobó el Reglamento 5020, por medio del cual dispuso que en caso de que se vendiera un vehículo en exceso del precio sugerido de venta al consumidor, ello se tenía que eviden *259 ciar ante la agencia para determinar si el incremento estaba sujeto al pago de arbitrios adicionales. De esta forma, tal como argumentó el Estado, desde la aprobación del Reglamento 5020 el Secretario de Hacienda instituyó que la declaración de la venta y el pago por la diferencia en arbitrios era un requisito previo para la otorgación de una certificación de pago de arbitrios válida para la inscripción en el DTOP.
Ahora bien, el Reglamento 5020 fue derogado por el Reglamento 7215 de 1 de septiembre de 2006 (Reglamento 7215), el cual, a su vez, fue derogado por el Reglamento 7437 de 14 de diciembre de 2007 (Reglamento 7437). No obstante, tanto el Reglamento 7215 como el Reglamento 7437 mantuvieron esencialmente las mismas disposiciones reglamentarias en cuanto al asunto que nos atañe. Por lo tanto, con la aprobación del Reglamento 7437 se sostuvo el sistema tributario implantado a partir del Reglamento 5020; esto es, al presente se mantiene el requisito de tener que mostrar evidencia ante la agencia sobre si un vehículo se vende en exceso del precio sugerido de venta al consumidor. Así también para la emisión de una certificación de pago de arbitrios válida, actualmente la agencia exige presentar la declaración de la venta y realizar el pago por la diferencia en arbitrios.
En este sentido, según dispone la cláusula de retroactividad incluida en el Reglamento 7437, éste no alteró las normas reglamentarias vigentes a partir de la aprobación del Reglamento 5020. De esta forma, y como mediante el recurso presentado ante nuestra consideración se solicita que se declare inválida la facultad arrogada por el Secretario de Hacienda mediante la referida reglamentación, por estar el caso de autos aún en trámite, evaluaremos las disposiciones del Reglamento 7437 que es el que está vigente.
En cuanto al concepto “precio sugerido de venta al consumidor”, el Reglamento 7437 dispone:
*260 (i) “Automóviles nuevos para la venta”.— En el caso de automóviles nuevos, introducidos al país por distribuidores y traficantes autorizados, el “precio sugerido de venta al consumidor” significa aquel precio por el cual el vehículo o vehículos similares serán vendidos al detal al público consumidor en el mercado libre, excluyendo el arbitrio.
Este “precio sugerido de venta al consumidor” nunca podrá ser menor del costo básico del modelo. El “precio sugerido de venta al consumidor” incluirá el costo básico del modelo y lo siguiente: el equipo opcional instalado en fábrica, los seguros y fletes de importación, el margen de ganancia para la venta, los costos asociados con la preparación y entrega del vehículo, y cualquier otro costo relacionado con la entrega del vehículo. Disponiéndose, sin embargo, que el “precio sugerido de venta al consumidor” no tiene necesariamente que ser igual para todos los concesionarios. ... Toda declaración de venta en ex-ceso del precio sugerido de venta al consumidor será examinada para determinar si el incremento está sujeto al pago de arbitrios adicionales. (Énfasis suplido.)(39)
Además, el Art. 2011(a)-4 del Reglamento 7437 especifica el procedimiento a llevarse a cabo para la declaración de arbitrios en los casos de los automóviles:
... (a) Distribuidores.- (1) Todo distribuidor que se proponga introducir automóviles a Puerto Rico, someterá al Secretario una declaración de arbitrios, 15 días antes de la fecha de autorización del levante de los embarques del muelle, incluyendo una relación detallada de los automóviles a ser recibidos, con el precio sugerido de venta al consumidor para cada uno y la información que se establece más adelante. El distribuidor incluirá cualquier otro documento que el Secretario determine.
(4) En el caso de distribuidores que importan automóviles nuevos a Puerto Rico y que mantienen una relación comercial con uno o más vendedores de vehículos de motor al detal (“dealers”), a los fines de que esos vendedores de vehículos de motor al detal realicen las ventas al detal de dichos automóviles, el precio sugerido de venta al consumidor dispuesto en el inciso (1) de este párrafo será aquel que el vendedor de vehículos de motor al detal utilizará para la venta de dichos vehículos al detal.
*261 Esto presupone que el distribuidor determinará el precio sugerido de venta al consumidor para el embarque correspondiente, incluyendo todos los elementos de precio necesarios que hacen posible la presentación de los automóviles al público consumidor y que constituyen el precio de oferta de esos automóviles al detal.
(d) Declaración de arbitrios enmendada por cambio en el precio sugerido de venta.- (1) En el caso de que el distribuidor o traficante autorizado, según aplique, incluya en la declaración de arbitrios y en la correspondiente etiqueta adhesiva, un precio sugerido de venta al consumidor menor al precio de oferta al detal que el vendedor de vehículos de motor al detal (“dealer”) o concesionario exhibirá en el vehículo particular, será responsabilidad del distribuidor o traficante autorizado, según sea el caso, rendir ante el Director una declaración de arbitrios enmendada que refleje el precio sugerido de venta al consumidor correcto, y satisfacer el pago de arbitrios correspondiente por la diferencia en la base contributiva. En este caso, el Negociado entregará, emitirá o permitirá al distribuidor o traficante autorizado, según corresponda, imprimir una nueva etiqueta adhesiva, que reflejará el nuevo precio sugerido de venta al consumidor y que sustituirá la etiqueta que originalmente se le entregó o autorizó a imprimir a dicho distribuidor o traficante autorizado para el vehículo en particular.
(2) No obstante lo anteriormente dispuesto, cuando sea el vendedor de vehículos de motor al detal (“dealer”) el que gestione un aumento al “precio sugerido de venta al consumidor”, el vendedor de vehículos de motor al detal notificará inmediatamente al distribuidor o traficante autorizado, según sea el caso, su deseo de solicitar el aumento y la emisión de una nueva etiqueta adhesiva acompañando con la solicitud el importe de los arbitrios correspondiente a la diferencia en la base contributiva. Una vez el distribuidor o traficante autorizado, según sea el caso, reciba la solicitud del vendedor de vehículos de motor al detal, el distribuidor o traficante autorizado entonces presentará la misma ante el Director y se emitirá o autorizará la impresión de una nueva etiqueta.
En caso de que el vendedor de vehículos de motor al detal notifique al distribuidor o traficante autorizado un “precio sugerido de venta al consumidor” mayor al que hubiese declarado el distribuidor o traficante autorizado, y el automóvil aún no se haya introducido en Puerto Rico, el distribuidor o traficante autorizado estará obligado a declarar dicha unidad con *262 el “precio sugerido de venta al consumidor” que el vendedor de vehículos de motor al detal informe.
En aquellos casos en que el “dealer” no informe al distribuidor o traficante autorizado su intención de aumentar el “precio sugerido de venta al consumidor” y no acompañe el pago de arbitrios por la diferencia, será responsabilidad de dicho “dealer” el pago de los arbitrios por la diferencia, más los intereses, penalidades, multas y recargos correspondientes. No obstante, en aquellos casos donde el “dealer” notifique por escrito al distribuidor o traficante autorizado el “precio sugerido de venta al consumidor” para un vehículo en particular, el distribuidor o traficante autorizado deberá declarar dicho vehículo con el “precio sugerido de venta al consumidor” notificado por dicho “dealer”.
(3) El pago de los arbitrios correspondientes por la diferencia en la base contributiva se efectuará dentro de los 15 días siguientes a la fecha de venta, o dentro de los 15 días siguientes a la fecha en que el traficante autorizado o vendedor de vehículos de motor al detal haya permitido el uso de los vehículos en las vías públicas, lo que ocurra primero.
(4) En aquellos casos en que un vendedor de vehículos de motor al detal venda un vehículo introducido por un traficante autorizado y éste no informe el aumento en el precio sugerido de venta al consumidor, el traficante autorizado (introductor) tendrá la responsabilidad de pagar la diferencia en arbitrios más los intereses, recargos, penalidades y multas correspondientes, sobre la diferencia entre el precio de venta final al consumidor y el precio sugerido de venta especificado en la declaración original. (Énfasis suplido.)(40)
De una lectura de las disposiciones reglamentarias transcritas, se puede colegir que el sistema tributario implementado por el Secretario de Hacienda es nulo, pues está en conflicto con los preceptos legales establecidos en el propio Código de Rentas Internas. Veamos.
El procedimiento reglamentario para la declaración de arbitrios obliga al importador o distribuidor que con poste *263 rioridad al evento contributivo notifique al Departamento de Hacienda el precio en que finalmente todo concesionario negoció cada uno de los vehículos nuevos que le distribuyó. Además, exige que esta notificación esté acompañada del pago de los arbitrios que emanan de la diferencia que surge entre el precio sugerido de venta declarado por el importador al momento del embarque y el precio en que el concesionario efectuó la venta del vehículo.
De esta forma, tanto el requerimiento de la notificación como el del pago de arbitrios adicionales constituye una autoridad arrogada por el Secretario de Hacienda que no sólo se encuentra ausente en el Código de Rentas Internas, sino que contraviene la letra clara del fundamental estatuto. Y es que el referido Código establece, diáfanamente, que el Secretario de Hacienda puede intervenir o exigir el pago adicional de arbitrios sólo si el precio sugerido de venta no refleja razonablemente el precio del vehículo, lo que tiene que determinar previo a permitir su embarque.(41) Incluso, esta facultad del Secretario para decretar que el precio sugerido de venta informado por el distribuidor es irrazonable para ese modelo de automóvil, tendrá que estar fundamentada en cualquier fuente de información debidamente reconocida en la industria automotriz de Estados Unidos de América.(42)
Indudablemente, una fuente de información reconocida en la industria automotriz no puede ser la definición que el propio Secretario de Hacienda, mediante la aludida reglamentación, pueda otorgarle a la base contributiva del “precio sugerido de venta al consumidor”. Más aún cuando los términos en que está redactada dicha definición reglamentaria amplían la base contributiva estatutaria de tal forma que la equipara a lo que constituye el precio final de venta. Ello, puesto que mediante la referida definición el Secreta *264 rio se atribuye la facultad de examinar “[t\oda declaración de venta en exceso del precio sugerido de venta al consumidor ... para determinar si el incremento está sujeto al pago de arbitrios adicionales”. (Enfasis suplido.)(43)
Además, examinar una declaración de venta de un vehículo obligatoriamente nos conduce a mía etapa posterior a aquélla en que el importador declaró el precio sugerido de venta y fue aprobado por el Secretario de Hacienda. En otras palabras, el hecho de que un concesionario no importador efectúe la venta de un vehículo, necesariamente implica que ya se produjo el embarque del vehículo con la anuencia del Secretario y de acuerdo con el precio sugerido informado. Por lo tanto, en esa etapa del procedimiento se ha extinguido la facultad del Secretario para determinar si el precio sugerido de venta refleja o no razonablemente el precio del vehículo para emitir una certificación de pago de arbitrios. Ello, debido a que el Código de Rentas Internas dicta que la potestad del Secretario de cobrar al distribuidor el impuesto a base de un precio sugerido de venta razonable se realizará “al momento de la introducción del vehículo al país”.(44)
Por otro lado, es menester puntualizar que el Código de Rentas Internas dispone expresamente que la facultad delegada al Secretario de Hacienda de determinar la razonabilidad del precio sugerido de venta previo al em-barque en ningún caso se entenderá que le autoriza a sustituir, como norma de aplicación general, la base del precio sugerido de venta por cualquier otra base fiscal alterna.(45) Por lo anterior, y como el sistema tributario implementado mediante la referida reglamentación contraviene este precepto legal —pues precisamente constituye una alteración *265 ilegal y de aplicación general de la base contributiva— nos vemos obligados a declararlo nulo.
Asimismo, debemos destacar que como parte de este sistema tributario que por la presente anulamos, está la disposición reglamentaria que coloca al concesionario en la posición del contribuyente. Sobre el particular, el Reglamento 7437 dispone que cuando el concesionario no le informa al importador o distribuidor su intención de vender el vehículo a un precio mayor que el previamente sugerido para la venta y, en consecuencia, no acompaña el pago de arbitrios por la diferencia, el concesionario será responsable del pago de esos arbitrios más los intereses, las penalidades, las multas y los recargos correspondientes.(46) Como se aprecia, esta disposición reglamentaria está claramente en conflicto con el Código de Rentas Internas en la medida en que éste expresamente estatuye que en los casos de los artículos importados que estén gravados con el pago de arbitrios, “la persona responsable del pago de los impuestos o contribuyente lo será ... [e]l consignatario, si el artículo viene consignado directamente a un consignatario”.(47)
La consecuencia ineludible de mantener vigente el sistema tributario antes descrito sería permitir que el Secretario de Hacienda sustituya el criterio del legislador por el suyo, ya que este funcionario exige que se tribute por el precio final de venta con posterioridad al embarque del vehículo, y no por el precio sugerido de venta según determinado y aceptado por él previo al embarque, en aquellos casos en que el precio final de venta sea mayor al sugerido.(48) Además, sustituye el juicio legislativo al posi *266 donar al concesionario —no importador de vehículos— en el lugar del consignatario, quien figura como el contribuyente ante la ley. Como tal, este funcionario ha implementado un sistema contributivo contrario al dispuesto en el Código de Rentas Internas, lo que constituye una actuación ultra vires. Por lo tanto, las disposiciones del Reglamento 7437 que instrumentan el sistema tributario aludido, tienen que ceder ante el mandato legislativo pues, como sabemos, “el texto de una ley jamás debe entenderse modificado o suplantado por el reglamentario ...”.(49)
V
La capacidad del Secretario de Hacienda de notificar una deficiencia contributiva con posterioridad al embarque del vehículo, mediante el procedimiento formal dispuesto en la See. 6002 del Código de Rentas Internas, 13 L.P.R.A. see. 8022, no es lo que está en controversia en el presente caso. Lo que está aquí en controversia es la capacidad del Secretario para, tras el embarque del vehículo, rehusarse a emitir una certificación de pago de arbitrios válida a pesar de que en su momento entendió que el precio sugerido de venta informado por el importado era razonable, pues precisamente por ello se introdujo el vehículo al país.
De esta forma, si el Secretario de Hacienda pretende variar el arbitrio fijado luego de haber otorgado su anuencia para el embarque del vehículo —por entender en ese momento que el precio sugerido de venta informado por el importador es razonable— tendrá que regirse por el procedimiento formal establecido en el Subtítulo F, See. 6002 del Código de Rentas Internas. Ello, debido a que la See. *267 2011(c)(2) del Código dispone que “ [1] a determinación del Secretario se presumirá sin menoscabo de las disposiciones establecidas en el Subtítulo F”.(50)
El procedimiento estatuido en la referida See. 6002 impone, en síntesis, la obligación del Secretario de Hacienda de notificarle al contribuyente su determinación de deficiencia contributiva y proveerle la oportunidad de impugnarla, para luego agotar los remedios administrativos o cuestionar la deficiencia notificada mediante un juicio de novo en el Tribunal de Primera Instancia.(51) Claro está, la disponibilidad de este procedimiento surge con posterioridad a la declaración de arbitrios y al embarque del vehículo, es decir, luego del pago de las contribuciones según las declaró el importador y las aceptó o las alteró el Secretario. Esto, ya que la Sec. 2011(c)(9) del Código supedita la no inscripción del vehículo en el DTOP a la falta de pago del arbitrio, según lo fija el procedimiento establecido en la propia Sec. 2011(c)(1), la cual establece que éste se fija a partir de la anuencia o de la alteración del Secretario de la declaración del precio sugerido de venta que emite el importador previo a la autorización del embarque.(52)
Como vemos, según la See. 2011, el cobro del arbitrio no está sujeto a un procedimiento de adjudicación formal como el establecido en la See. 6002, sino que el cobro del arbitrio está garantizado con la facultad del Secretario de Hacienda de impedir el embarque y el registro en el DTOP (al poderse negar a emitir una certificación de pago de arbitrios válida). De esta forma, la facultad del Secretario —de acuerdo con la See. 2011— de impedir el registro del vehículo, termina con su anuencia para el embarque y el pago de los arbitrios, según informados por el importador, o según alterados por el funcionario dentro del periodo de *268 quince días dispuesto en esa sección.(53) Por lo tanto, concluimos que el procedimiento establecido en la See. 2011 para determinar el precio sugerido de venta en calidad de arbitrio, y la facultad del Secretario según dicha sección de impedir el registro en el DTOP, es un procedimiento muy distinto al procedimiento formal de determinación de deficiencia contributiva establecido en la See. 6002.
Ahora bien, es menester tener en cuenta que ambos procedimientos aplican exclusivamente al importador (distribuidor o consignatario) en la medida en que es éste el contribuyente, según dispone el Código de Rentas Internas. En consecuencia, el concesionario que no importa vehículos no está sujeto a ninguno de los procedimientos.
VI
A pesar de que el Código de Rentas Internas provee procedimientos distintos para verificar el arbitrio que se pagará por cada vehículo —dependiendo de la etapa en que el tributo esté en controversia— la práctica errada del Secretario de Hacienda es no emitir una certificación de pago de arbitrios válida hasta tanto se satisfaga la cantidad de arbitrios que resulte de la base contributiva ilegalmente impuesta; esto es, el precio de venta final del vehículo. De esta forma, cuando el precio de venta final del vehículo es mayor al precio sugerido de venta reportado por el importador, los consumidores adquieren los vehículos de un concesionario pero no pueden disfrutar de éste pues, sin una certificación de pago de arbitrios válida, están impedidos de registrarlos en el DTOP Esto, debido a que el Reglamento 7437, en relación a la emisión de la certificación de pago de arbitrios, también dispone ultra vires:
... Luego de efectuada la venta al detal del automóvil, el vendedor de vehículos de motor al detal (o concesionario), im *269 portador o distribuidor, someterá ante el Departamento el Boleto de Verificación de Venta del Vehículo de Motor, Parte B de la etiqueta, debidamente completada, o cualquier otro documento que requiera el Secretario y que sea demostrativo de la venta. Esto constituirá un requisito previo a que el Secretario entregue a dicho vendedor de vehículos de motor al detal (o concesionario), importador o distribuidor la Certificación de Pago de Arbitrios que permitirá registrar el automóvil en el Departamento de Transportación y Obras Públicas. (Enfasis suplido.)(54)
De esta forma, al amparo de una insuficiencia en el pago de arbitrios que realmente no es tributable pues es inválida en derecho, el Departamento de Hacienda grava los automóviles introducidos a Puerto Rico e impide que los inscriban como corresponde en el DTOP. Es precisamente la no expedición de una certificación de pago válida lo que impide la inscripción del vehículo en el DTOP, ya que el Código de Rentas Internas dispone que el Secretario de Transportación y Obras Públicas no emitirá a persona aigima una licencia o tablilla para un vehículo a menos que la persona muestre evidencia fehaciente del pago del arbitrio, entiéndase, a menos que el Secretario de Hacienda emita la correspondiente certificación de pago de arbitrios sin limitación alguna de su faz.(55)
VII
Conforme a nuestro ordenamiento constitucional, “la facultad para imponer contribuciones compete primordialmente a la Rama Legislativa”.(56) Por eso, el legislador fue claro al establecer en el Código de Rentas Internas que la base contributiva es el “precio sugerido de venta al consumidor”, y el importador es quien lo deter *270 mina antes de introducir el vehículo en Puerto Rico. Ciertamente, la definición estatutaria de ese concepto incluye un componente de margen de ganancia —actualmente, margen de ganancia estimada— pero éste también se determina al momento del embarque, por lo que no es equiparable al precio en que posteriormente lo logre vender el concesionario. Tanto es así, que del propio historial legislativo se desprende que el legislador concibió el precio sugerido de venta como “lo más que se acerca al precio de venta al consumidor”,(57) por lo que resulta forzoso concluir que el precio sugerido de venta no es lo mismo que el precio final de venta, aun cuando el primero contenga el margen de ganancia para la venta como un componente a tenerse en cuenta. Equiparar el uno con el otro equivale a establecer como base contributiva un impuesto sobre la venta, lo cual, como vimos, el legislador buscó evitar sin excepción alguna.
Más aún, del debate legislativo transcrito anteriormente se deriva que la Asamblea Legislativa consideró la posibilidad de establecer el momento de la venta final ál consumidor como el evento contributivo, según proponía el proyecto original, pero lo rechazó. Por esta razón, se sometió un proyecto sustitutivo que fue el que finalmente incorporó el precio sugerido de venta al consumidor como base contributiva. En fin, si la intención legislativa fue utilizar el precio de venta final como base para el cómputo de los arbitrios, éste se hubiese consignado expresamente en la ley, ya que la legislatura consideró esa posibilidad.
En este sentido, el Secretario de Hacienda, mediante la reglamentación antes discutida, excede sus facultades y actúa ilegalmente al utilizar el precio final de venta al consumidor para reevaluar el precio sugerido de venta que dispone la ley como base para calcular el arbitrio, pues *271 sustituye el criterio objetivo que fijó la Asamblea Legislativa por el suyo, el cual fue específicamente descartado por el legislador. Además, al imponer su criterio mediante el proceso de reglamentación, según lo hemos reseñado, el Secretario de Hacienda viola el mandato legislativo al: (a) pretender cobrar el arbitrio al concesionario; (b) no emitir una certificación de pago válida para que los consumidores puedan inscribir sus vehículos en el DTOP luego del evento contributivo, y (c) establecer una base tributaria alterna para determinar los arbitrios de los vehículos.
Por ello, en nuestra función revisora de reglamentos administrativos, determinamos que la reglamentación que instrumenta el sistema tributario impuesto por el Secretario de Hacienda para determinar el pago de los arbitrios en el caso de los automóviles es nula, ya que el legislador reconoció únicamente el precio sugerido de venta como la base contributiva para los vehículos de motor importados, el que se determina al momento de introducir éstos al país. De esta forma hacemos valer el principio elemental de que cuando la legislatura delega en una agencia el poder para promulgar reglamentos, éstos, para ser válidos, no pueden estar en conflicto con las normas establecidas en la propia ley, pues ello conlleva la sustitución del criterio del legislador por el de la agencia autorizada a reglamentar.(58)
En este sentido, las disposiciones reglamentarias concernientes tienen que ceder ante el mandato legislativo ya que el texto del Código de Rentas Internas no puede entenderse modificado o suplantado por el reglamentario. Téngase en cuenta que al encontrarnos ante un estatuto que impone contribuciones o impuestos, es nuestro deber interpretarlo restrictivamente, de forma justa y de acuerdo con sus propios y expresos términos. Por esta razón, estamos obligados a decretar inválidos: el inciso (25)(i) del Art. *272 2001-1; los incisos (a)(4) y (d) del Art. 2011(a)-4, y el Art. 2011(c)(3)-5 del Reglamento 7437.(59)
Tal como corresponde, al realizar el análisis restrictivo del estatuto ante nuestra consideración, se desprende claramente que la Asamblea Legislativa no dejó al Departamento de Hacienda desprovisto de un procedimiento que le permitiese fiscalizar la aplicación de la nueva base contributiva. Si el Secretario de Hacienda no está conforme con el precio sugerido de venta declarado por el importador, previo al embarque del vehículo, el Código de Rentas Internas le provee un mecanismo mediante el cual puede modificarlo y cobrar los arbitrios correspondientes a base de un precio sugerido de venta razonable. En específico, sólo puede modificar el precio sugerido de venta determinado por el importador cuando éste no sea razonable en comparación con el de modelos similares al momento introducir el vehículo en Puerto Rico, siempre que dicha irracionabilidad esté fundamentada en una fuente de información debidamente reconocida por la industria automotriz.(60) Sin embargo, la sustitución del precio sugerido de venta por parte del Secretario de Hacienda no se puede realizar de forma generalizada ni como pretexto para sustituir la base del precio sugerido de venta por cualquier otra base fiscal alterna.(61)

Si el Secretario de Hacienda asiente al precio su
*273
gerido de venta declarado por el importador y no le notifica la sustitución de éste por uno más razonable conforme al procedimiento aludido, el arbitrio se fija. Una vez fijado, el importador paga el arbitrio según aceptado o según sustituido por el Secretario, e introduce el vehículo en Puerto Rico libre de gravamen, esto es, con el derecho a obtener una certificación de pago de arbitrios válida.

De acuerdo con lo anterior, y teniendo en cuenta que en el presente caso el Secretario de Hacienda no realizó determinación alguna sobre si el precio sugerido de venta al consumidor que informó Motorambar era irrazonable, se fijó el arbitrio y se embarcaron los vehículos que adquirió posteriormente Yiyi Motors. Así las cosas, el Secretario no podía impedir la inscripción de éstos ya que, por haberse fijado el arbitrio, la Sec. 2011(c)(9) del Código de Rentas Internas no se lo permite.(62) Más bien, el criterio que utilizó el Secretario para impedir la inscripción fue la diferencia entre el precio sugerido de venta al consumidor informado por Motorambar —aceptado por el propio Secretario— y el precio en que Yiyi Motors vendió los vehículos a los consumidores. Sin embargo, como se ha establecido, dicho criterio fue rechazado por la Asamblea Legislativa y, conforme a ello, hoy este Tribunal lo descarta.
Por lo tanto, en la medida en que el Secretario se arroga la facultad de impedir el registro de los vehículos mediante la no expedición de una certificación de pago de arbitrios válida luego de fijar los arbitrios y efectuar el embarque, este funcionario actúa ilegalmente. Y al así actuar, le causa daños a Yiyi Motors ya que éste, como es de esperarse de un concesionario de vehículo de motor altamente conocido en este país, ha vendido cientos de vehículos, los que no ha podido inscribir por carecer de una certificación de pago de arbitrios válida.
*274 VIII
Establecida la falta de autoridad del Secretario de Hacienda para imponer el aludido sistema tributario, pasemos a considerar si procede el injunction solicitado por Yiyi Motors.
De entrada, debemos tener en cuenta que en el presente caso no existe controversia sobre el hecho de que el contribuyente es Motorambar, en calidad de consignatario, no así Yiyi Motors —quien figura como concesionario que no importa vehículos de motor— pues, como ya expusimos, el Estado no recurrió del dictamen que emitió a esos efectos el Tribunal de Primera Instancia.
El Código de Rentas Internas dispone diáfanamente que en los casos de artículos importados que estén gravados con el pago de arbitrios, “la persona responsable del pago de los impuestos o contribuyente lo será ... [e]l consignatario, si el artículo viene consignado directamente a un consignatario”.(63) Desde esta perspectiva, resulta forzoso razonar que el hecho de que el Secretario de Hacienda haya intentado cobrar contribuciones a quien claramente no es un contribuyente ante la ley, constituye una actuación extraordinaria y palmariamente ilegal que un tribunal de justicia no puede refrendar.
Sobre este particular, en Durlach Bros., Inc. v. Domenech, Tes., 47 D.P.R. 654, 659 (1934), se ha establecido que cuando se le intenta cobrar a cierta persona contribuciones que, de ser adeudadas, las debe otra, se considera que eso presenta un caso excepcional en el que los tribunales pueden ejercer su jurisdicción de naturaleza ex-traordinaria mediante la concesión del injunction. Así decidimos hace exactamente tres cuartos de siglo atrás, cuando la Ley de Injuction prohibía, y aún prohíbe, la ex- *275 pedición de este tipo de recurso para impedir la imposición o el cobro de cualquier contribución establecida por ley.(64) Ahora bien, téngase en cuenta que dicha prohibición estatutaria es efectiva únicamente para cuando quien presenta el injunction para impedir el cobro de contribuciones es el contribuyente ante la ley, esto es, Motorambar en el caso de autos. Ello así, toda vez que el deber de “pagar las contribuciones bajo protesta ... es aplicable únicamente a personas que están sujetas al pago de contribuciones según las leyes de Puerto Rico.... Naturalmente, en un caso corriente las contribuciones deben ser pagadas bajo protesta”.(65)
Más aún, hemos señalado que cuando se presenta una demanda de injunction para impedir el cobro de contribuciones y el demandante aduce que no las puede pagar, no es necesario probar daños irreparables más allá de los alegados en general en la demanda.(66) En este sentido, en Durlach Bros., Inc. v. Domenech, Tes., supra, se culminó la exposición del caso de la misma forma que hoy podríamos hacerlo:
Haciendo un ligero resumen de los méritos: la demandante adujo un caso claro de que las contribuciones cuya devolución se trataba de obtener no eran pagaderas en forma alguna por la demandante Durlach Brothers.
Cuando los hechos son tan claros como en el presente caso, no es necesario que la demandante pruebe daños irreparables en adición a los alegados en la demanda. Daños irreparables serían la necesidad por parte de la demandante de pagar contribuciones que a lo sumo serían adeudadas por otra persona.(67)
De esta forma, ya que Yiyi Motors claramente nunca figuró como el contribuyente ante la ley, desde el momento *276 en que el Secretario de Hacienda se atribuyó la facultad de imponerle el pago de arbitrios por la diferencia que surge cuando vende un vehículo a un costo mayor que el precio sugerido de venta declarado por el importador, el injunction constituyó el remedio legal adecuado para impedir la imposición de arbitrios que no le correspondía pagar. Recordemos que la acción que originó la controversia que llega ante nuestra consideración es precisamente una demanda de injunction mediante la cual el peticionario solicitó, entre otras cosas, que se le ordenara al Secretario de Hacienda que cesara y desistiera de imponerle el pago de arbitrios no autorizados en ley a los vehículos importados por Motorambar; contribuciones que, en cualquier caso, debía imponerle en calidad de consignatario conforme lo establece el Código de Rentas Internas.
Ante una alegación de tal índole, realizada expresamente en la demanda, y siendo tan claro el hecho de que no había autoridad legal para imponerle contribuciones a Yiyi Motors, se justificaba la aplicación del injunction como remedio extraordinario pues, según el peticionario fundamentó sus alegaciones, la letra clara de la ley impedía que se le considerara como el contribuyente. La redacción del articulado del Código de Rentas Internas no crea ninguna duda en cuanto a quién se considera el contribuyente, pues explícitamente dispone que es el consignatario de los vehículos de motor importados.
En este sentido, nos corresponde precisar que para casos en que resulta tan claro que el demandante no es el contribuyente, basta con que la demanda de injunction contenga alegaciones bien fundamentadas respecto a la irracionabilidad de que se le considere como el contribuyente ante la ley. Sin embargo, de surgirle alguna duda al tribunal, ya sea porque dichas alegaciones hayan sido efectivamente controvertidas o porque el estatuto en cuestión no resulta ser lo suficientemente claro, entonces no pro-cede el injunction como remedio extraordinario, sino que *277 dicho asunto debe evaluarse mediante el procedimiento ordinario disponible para eso.
En este punto, nos corresponde distinguir lo resuelto en Cafeteros de P.R. v. Tesorero, 74 D.P.R. 752 (1953), de lo establecido en Durlach Bros., Inc. v. Domenech, Tes., supra. A diferencia de la situación que presenta el caso de autos —similar a Durlach Bros., Inc. v. Domenech, Tes., 47 D.P.R. 654 (1934)— en Cafeteros de P.R. v. Tesorero, supra, existían serias dudas acerca de si la allí peticionaria del injunction podía considerarse como la contribuyente. Las palabras de esta Curia a esos efectos fueron:
[N]o es enteramente claro que la apelante no sea una contribuyente. Su status no se perfila con una claridad meridiana. ...
... De todos modos, basta con decir que la cuestión relativa al status de la apelante es debatible, lo cual acentúa más la aplicabilidad a este caso de la doctrina relativa a la improcedencia de los recursos de injunction y de sentencia declaratoria al tener la demandante un remedio adecuado en el curso ordinario de la ley.(68)
Según este marco fáctico, y ante la alegación de la entonces demandante en cuanto a que ella no podía ser considerada como la contribuyente ante la ley, este Tribunal se expresó de la forma siguiente:
[A] un si la apelante puede tener una base razonable para su contención de que ella no es una contribuyente sujeta al ámbito de la ley, las consideraciones de política pública que he-mos expuesto determinan que esa alegación de la apelante debe ser dilucidada en el procedimiento ordinario relativo al pago de contribuciones, y no en el procedimiento que ha escogido la apelante. ... Desde el punto de vista de la equidad, podría argumentarse que sería injusto y opresivo el obligar a una persona que claramente no es una contribuyente a pagar una contribución que ella no adeuda, y que es absolutamente nula, y luego obligarla a iniciar un procedimiento de reintegro. Pero no podemos olvidar que muchas doctrinas jurídicas son *278 resultado de un proceso de pesar y aquilatar distintos intereses y necesidades individuales y públicas. El interés en evitar una inconveniencia individual inmediata debe quedar subordinado, en estas situaciones, al interés social, de mayor significación, de evitar una paralización en las actividades gubernamentales. Hemos hablado de una inconveniencia individual inmediata, y no permanente, ya que la doctrina en discusión presume la existencia de un remedio adecuado en ley, en el cual las alegaciones de la reclamante han de dilucidarse fínalmente.(69)
Sin embargo, dicha expresión se realizó en un caso en el que este Foro se inclinaba a determinar que la solicitante del injunction sí era la contribuyente. Tanto es así, que en la disposición de Cafeteros de P.R. v. Tesorero, supra, se manifestó que la definición reglamentaria del término “comprador” de café —quien tenía la condición de contribuyente ante la ley— le aplicaba a la peticionaria.(70) De igual forma, en el referido caso, según concluyó esta Curia, no procedía el injunction porque, además, no se había demostrado que concurrieron circunstancias extraordinarias que justificaran su expedición.(71) Por esta razón, la expresión reseñada a los efectos de que se puede obligar a una persona que claramente no es una contribuyente a pagar una contribución que no adeuda, se realizó al margen de la realidad que presentaba Cafeteros de P.R. v. Tesorero, supra, pues en éste existían serias dudas en cuanto a la condición de contribuyente de la peticionaria, lo que a su vez limitaba la posibilidad de que concurrieran circunstancias extraordinarias.
Muy distinta situación se presentó en Durlach Bros., Inc. v. Domenech, Tes., supra, y se presenta hoy en el recurso ante nuestra consideración. En ambos no existía ni existe la más mínima duda en cuanto a que los solicitantes del injunction no eran los contribuyentes. Precisamente, *279 ello de por sí configura una circunstancia extraordinaria. De esta forma, ante la particularidad del caso de autos, no nos vemos obligados por tal expresión realizada dentro de un contexto en el que era debatible la condición de contribuyente de la peticionaria, sino que lo que corresponde es, debido a su similitud, aplicar el precedente judicial de Durlach Bros., Inc. v. Domenech, Tes., supra. Por ello, aclaramos que para casos excepcionales como el presente, en el que claramente el demandante no figura como un contribuyente ante la ley, y a pesar de eso el Estado insiste en cobrarle un tributo que no le aplica, se mantiene vigente la doctrina establecida en Durlach Bros., Inc. v. Domenech, supra.
De esta forma, si un ciudadano logra demostrar con claridad meridiana que no puede ser considerado como un contribuyente ante el tributo que se le ha impuesto, resulta irrazonable obligarle a tributar para luego hacerle agotar los mecanismos administrativos y judiciales disponibles. Lo contrario implicaría malgastar recursos del Estado para llegar a la misma conclusión que se pudo haber conocido desde el comienzo mediante la utilización del remedio extraordinario del injunction: su condición de no contribuyente. Así se evita que los ciudadanos sean sometidos a procedimientos engorrosos de manera innecesaria. Precisamente, para impedir que el Estado especule erróneamente con la tranquilidad y el dinero de nuestro pueblo, este Tribunal ya ha pautado la procedencia del injunction en estas circunstancias especiales y excepcionales.
Distinta es la situación en la que el demandante es el contribuyente o existen dudas sobre su condición como tal. Ello no puede considerarse como una circunstancia especialmente extraordinaria. En este tipo de casos no procede un injunction para evitar el pago de contribuciones que pueden ser adeudadas, pues es superior el interés del Gobierno de obtener aquellos recursos fiscales necesarios para su funcionamiento. En esta situación, el demandante *280 tiene a su alcance la posibilidad de presentar una solicitud de reintegro ante el Departamento de Hacienda. Recordemos que, tal como se expresó en Cafeteros de P.R. v. Tesorero, supra, “[l]a doctrina prohibitoria de injunctions al existir un remedio adecuado en ley se basa en el deseo de evitar la paralización de las actividades gubernamentales, en armonía con la protección de los intereses legítimos del contribuyente al concederle a éste una oportunidad razonable de hacer valer sus derechos en el remedio ordinario en ley que está a su alcance”. (Énfasis suplido.)(72)
Como hemos visto, está establecido en nuestra jurisprudencia que los tribunales tienen jurisdicción para entender en una demanda de injunction para impedir el cobro de contribuciones si el demandante aduce que no las tiene que pagar. De manera que hoy no nos arrogamos nmguna facultad legislativa, sino que avivamos los pronunciamientos realizados por esta Curia hace muchos afios.
Como el caso ante nos es de naturaleza extraordinaria, lo que hace inaplicable la prohibición estatutaria a la ex-pedición de injunction para impedir el cobro de contribuciones, analicemos si aplica la otra prohibición establecida en la Ley de Injunction en la que ésta impide la concesión de tal remedio extraordinario para evitar la aplicación de una ley o el cumplimiento de una actuación autorizada por una ley, a menos que se hubiera determinado por sentencia final y firme que dicha ley o actuación es inconstitucional o inválida.(73)
En respuesta a la actuación claramente ilegal del Secretario de Hacienda, nos corresponde precisar que anteriormente hemos expresado que el recurso de injunction es el remedio adecuado y disponible para que un ciudadano impida que un funcionario, al poner en vigor una legislación, *281 actúe contrario a lo dispuesto en ésta o en exceso de la facultad otorgada por dicho estatuto.(74) Ahora bien, el criterio para determinar si la actuación de un funcionario está comprendida dentro de la autoridad conferida por ley, no consiste en evaluar si la actuación es válida o constitucional, según ha sido autorizada por el legislador.(75)
La importancia de lo anterior está en que, conforme al Código de Enjuiciamiento Civil, los tribunales es-tan impedidos de expedir un injunction para examinar la constitucion.alidad o validez de la actuación de un funcionario, a menos que se haya decretado por sentencia final, firme, inapelable e irrevisable que dicha actuación autorizada por la Asamblea Legislativa es inconstitucional o inválida.(76) En cambio, silo que se pretende es determinar si la actuación está comprendida dentro de la autoridad que le conflere el estatuto a! funcionario, entonces, en ausencia de im remedio adecuado en el curso ordinario de la ley, procede declarar con lugar la solicitud de injunction.(77)
Precisamente, debido a que debe existir alguna forma de proteger al público contra la aplicación ilegal que de los estatutos hacen los funcionarios, en ausencia de otro remedio disponible en ley, los tribunales no están impedidos de asumir jurisdicción cuando se presenta una demanda de injunction que tiene como objetivo investigar la legalidad de los actos oficiales.(78) “Los actos de todos [los] funcionarios deben estar justificados por alguna ley, y en caso de que un funcionario viole el estatuto en perjuicio de alguna *282 persona, las cortes generalmente tienen jurisdicción para conceder reparación.”(79)
Como resultado de lo anterior, el injunction solicitado por Yiyi Motors es el remedio adecuado para impedirle al Secretario de Hacienda que, al poner en vigor el Código de Rentas Internas, actúe contrario a lo dispuesto en éste o en exceso de la facultad que le confiere dicho estatuto. En otras palabras, como el Secretario de Hacienda actúa sin autoridad legal para ello o la excede, el injunction es el mecanismo disponible para que Yiyi Motors proteja su propiedad contra la aplicación ilegal que del Código de Rentas Internas haga este funcionario.(80)
"Debe tenerse presente que el auto de injunction es el brazo enérgico de la justicia para la protección de los ciudadanos contra los desmanes de los funcionarios püblicos que actuando so color de autoridad les causan dafto irreparable."(81) Ahora bien, el criterio de daflo irreparable "tiene que enmarcarse dentro de otro más amplio y flexible que es el que propugna la procedencia del injunction siempre que el remedio existente en el curso ordinario de la ley no proteja adecuadamente los derechos sustantivos del peticionario tan pronto, rápido y eficaz, como lo protegerla un derecho de los de `equidad'".(82)
De acuerdo con lo anterior, de no ser por el recurso ex-traordinario de injunction, Yiyi Motors se vería desprovisto de un remedio eficaz para impugnar la actuación ilegal del Secretario de Hacienda y solicitar el cese y desista de ésta. No hay remedio adecuado existente en el curso ordinario *283 de la ley que Yiyi Motors pueda ejercitar para evitar que, por las actuaciones ilegales de este funcionario, se interrumpan sustancial e incesantemente sus operaciones comerciales, y a su vez impedir que se afecten los derechos de los cientos de consumidores que adquirieron vehículos de éste y que no han podido disfrutar de ellos por la negativa del Secretario de Hacienda de emitir una certificación de pago de arbitrios válida.(83)
Téngase en cuenta que el Secretario de Hacienda mantiene la facultad de fiscalizar el pago de contribuciones y determinar si surge alguna deficiencia contributiva mediante el procedimiento formal establecido en la See. 6002 del Código de Eentas Internas. Empero, ello no puede realizarlo a merced de afectar los derechos del concesionario y de sus consumidores. En este sentido, debe quedar claro que mediante este dictamen no estamos impidiéndole al Secretario de Hacienda que cobre las contribuciones que en efecto el contribuyente pueda adeudar, sino que lo que se requiere de este funcionario es que actúe dentro del marco de la ley.
Por último, como se ha demostrado, el criterio rector para la Opinión que hoy emitimos se basa en interpretar la ley tal cual la Asamblea Legislativa la concibió, redactó y aprobó. Sin embargo, no podemos pasar por alto los efectos beneficiosos que ésta acarrea para la industria automotriz y, en consecuencia, para la recuperación de nuestra maltrecha economía.
Como sabemos, la venta de los vehículos de motor ha disminuido considerablemente como consecuencia de la recesión económica. Tanto es así, que corporaciones de gran renombre se han visto en la obligación de cesantear em *284 pleados e, incluso, algunas de ellas se han fusionado para sobrellevar las pérdidas de capital que han sufrido debido a la poca demanda de parte de los consumidores. Precisamente, para contrarrestar la crisis de la industria automotriz, hasta hace muy poco el Gobierno estadounidense instrumentó un plan de incentivos monetarios que tenía el objetivo de detener la pérdida estrepitosa que padecían y aún padecen muchas de estas corporaciones que integran la industria de los vehículos de motor.
Dentro de este contexto de desasosiego económico, la determinación que hoy alcanzamos al menos aliviana la crisis en la que están sumergidos los concesionarios del país, pues eliminamos una carga contributiva que se les impuso ilegalmente. Y, a su vez, al eliminarla, contribuimos —al menos— con que se aminore la crisis de la industria automotriz en Puerto Rico ya que de ahora en adelante los consumidores no tendrán que pagar, como parte del precio de venta, el arbitrio que por la presente anulamos.
Por los fundamentos que anteceden, se revoca la Sentencia emitida por el Tribunal de Apelaciones y se concede el injunction solicitado por el peticionario para ordenarle al Secretario de Hacienda que cese y desista de utilizar el precio final de venta al consumidor como base fiscal para el cálculo de los arbitrios que se pagarían por los vehículos nuevos importados al país. De esta forma, se le instruye a este funcionario que, al determinar el tributo a satisfacerse, se atenga a la base contributiva establecida en el Código de Rentas Internas, esto es, al precio sugerido de venta al consumidor. En consecuencia, una vez se fija el arbitrio conforme al procedimiento estatuido en la Sec. 2011(c) del referido Código, el Secretario de Hacienda está obligado a emitir una certificación de pago de arbitrios válida para la inscripción del automóvil en el Departamento de Transportación y Obras Públicas. Debido a que la sustitución de la base contributiva por parte del Secretario de Hacienda se ha instrumentado mediante el Reglamento 7437, y como el *285 texto del Código de Rentas Internas no puede entenderse modificado o suplantado por el reglamentario, decretamos inválidos el inciso (25)(i) del Art. 2001-1, los incisos (a)(4) y (d) del Art. 2011(a)-4, y el Art. 2011(c)(3)-5 de dicho Reglamento. Además, se le ordena a este funcionario que armonice las restantes disposiciones del Reglamento 7437 conforme a lo aquí expuesto.

Se dictará sentencia de conformidad.

El Juez Asociado Señor Martínez Torres emitió una opinión de conformidad, a la cual se une la Jueza Asociada Señora Pabón Charneco. El Juez Presidente Señor Hernández Denton emitió una opinión disidente, a la cual se unió la Juez Asociada Señora Rodríguez Rodríguez. La Jueza Asociada Señora Fiol Matta emitió una opinión disidente.
Opinión de conformidad emitida por el
Juez Asociado Señor Martínez Torres, a la cual se une la Jueza Asociada Señora Pabón Charneco.
El Juez Presidente Señor Hernández Denton señala que se ve obligado a disentir “nuevamente”. Opinión disidente, pág. 296. Se refiere, sin duda, a las opiniones disidentes que ha emitido en los últimos meses. El hilo conductor entre estas opiniones disidentes es que para el Señor Juez Presidente, muchas de las decisiones del Tribunal que él preside son actos de “ ‘legislación judicial’ ”,(1) un “ ‘retroceso histórico’ ”,(2) “activismo judicial”,(3) y un “huracán de *286 cuyo embate nuestro pueblo tardará mucho tiempo en reponerse”. (Énfasis suprimido.)(4) A este popurrí de adjetivos, el Señor Juez Presidente ha añadido que varias decisiones de este Tribunal son “tecnicismos procesales”,(5) o un “mero ritualismo procesal”(6) que “responde más al automatismo y a la miopía judicial que a la precisión jurídica”,(7) o que responden a una “concepción formalista”,(8) producto de un “salto lógico”,(9) a un “raciocinio reduccionista”, es decir, a un “razonamiento autómata”,(10) o “un raciocinio que nos recuerda las distopías ficticias de George Orwell y la represión policíaca de los regímenes totalitarios de la historia moderna”(11). Para una repetición de todo lo anterior, véase la opinión disidente del Juez Presidente Señor Hernández Denton, a la cual se une la Juez Asociada Señora Rodríguez Rodríguez, págs. 294-295. Por último, el Señor Juez Presidente ha manifestado que “la mayoría parece desconocer el alcance de nuestras facultades como máximo y último Foro de nuestro país”.(12)
Por supuesto, la caricatura grotesca que se quiere pin-tar con estas frases no corresponde a la realidad de lo que ha resuelto este Tribunal. En verdad estamos ante dos visiones distintas de la función de la Rama Judicial y, en particular, de este Tribunal. Que quede claro que el Señor Juez Presidente tiene el derecho de discrepar de la visión mayoritaria. Soy el primero en defender ese derecho y, más aún, el derecho incuestionable del Señor Juez Presidente a expresar esa disidencia de la forma y en el momento que él *287 lo entienda necesario. Después de todo, la disidencia fuerte y vigorosa es saludable para el desarrollo del derecho en un foro colegiado como éste.
Sin embargo, eso no significa que yo deba permanecer callado. Precisamente porque conozco el alcance de mis facultades como integrante de este Tribunal, me veo igualmente obligado a responder de manera respetuosa y firme, al empleo más reciente de la hipérbole y de las visiones apocalípticas para demonizar, caricaturizar y deformar las decisiones de este Tribunal con los argumentos ficticios que postulan que este Tribunal resuelve de espaldas al Derecho y contra nuestro Pueblo. Infundir esos miedos no es gracioso, ni siquiera ante la cercanía del Día de Halloween.
La independencia judicial no está en juego aquí. Es tiempo que aceptemos que el cambio en visión y filosofía jurídica por el que atraviesa este Tribunal no significa el fin del mundo ni la hecatombe jurídica. Se trata del flujo normal de la marea judicial en una democracia, producto indirecto del mandato del Pueblo expresado donde corresponde, en las urnas. Ese es nuestro sistema constitucional. Desmerecer ese proceso democrático no le hace bien a Puerto Rico.
Desafortunadamente, este llamado a la cordura y a poner las cosas en su justa perspectiva ha caído en oídos sordos en este Tribunal. Se reclama tolerancia al disenso pero se le niega la misma tolerancia a las decisiones del Tribunal. En su lugar, se deforma el alcance y la intención de decisiones como la que hoy emitimos, repitiendo el miedo, la tergiversación y la caricatura para amedrentar al Pueblo al que servimos. Eso no honra la toga. Por el contrario, la desmerece.
Lo que incomoda no es la disidencia, sino el patrón de demonizar al Tribunal. Eso me produce una gran desilusión, como la que sintió y expresó Tarrou cuando escuchó por primera vez a la persona que tanto admiraba —su padre— abogar como fiscal por la pena capital para un con *288 victo: “Transfigurado por la toga roja, ni bonachón ni afectuoso, bullían en su boca las frases enormes que sin cesar salían de ella, como culebras.” A. Camus, La peste, 21ra ed., Buenos Aires, Ed. Sur, 1981, pág. 194.
Ahora es inevitable atender el incidente más reciente para asustar al Pueblo, al imputarse que la decisión de este Tribunal “tiene el potencial de descalabrar el sistema contributivo del país”. Opinión disidente del Juez Presidente Señor Hernández Denton, a la cual se une la Juez Asociada Señora Rodríguez Rodríguez, pág. 299. La opinión disidente aduce equivocadamente que la peticionaria Yiyi Motors, Inc. (Yiyi Motors), no tiene disponible el mecanismo de injunction para que el Secretario de Hacienda cese y desista de una práctica administrativa que le impide a Yiyi Motors inscribir en el registro del Departamento de Transportación y Obras Públicas los automóviles ya vendidos. Esa inscripción es indispensable para que Yiyi Motors pueda entregar a sus clientes los títulos de propiedad correspondientes. El Secretario de Hacienda insiste en no emitir una certificación de pago de arbitrios de dichos vehículos. Mientras eso no se haga, miles de ciudadanos carecen de un título inscrito sobre sus automóviles y, por consiguiente, Yiyi Motors se ve imposibilitada de cumplir con su obligación como vendedora de otorgar un título válido y completo a sus clientes.
Es correcto que en Puerto Rico se prohíba que un contribuyente obtenga el remedio extraordinario de injunction “[p]ara impedir la imposición o cobro de cualquier contribución establecida por las leyes de los Estados Unidos o de Puerto Rico”. Art. 678(7) del Código de Enjuiciamiento Civil de 1933, según enmendado, hoy conocido como Ley de Recursos Extraordinarios, 32 L.P.R.A. see. 3524(7). El propósito de esta prohibición es subordinar el interés individual de evitar una inconveniencia inmediata al interés social de evitar una paralización de las actividades gubernamentales. Cafeteros de P.R. v. Tesorero, 74 D.P.R. *289 752 (1953). La alegación de que el demandante no es un contribuyente según la ley o que el tributo es ilegal, sin más, no es suficiente para justificar una demanda de injunction de contribuyente. Id., pág. 765; D. Rivé Rivera, Recursos extraordinarios, 2da ed. rev., San Juan, Programa de Educación Jurídica Continua, Universidad Interamericana de Puerto Rico, 1996, pág. 67. En esos casos, el procedimiento de pago y la solicitud de reintegro de contribuciones pagadas ilegalmente se consideran adecuados. Descartes, Tes. v. Tribl. Contrib. y Trigo Hnos., 73 D.P.R. 295 (1952). La única excepción bajo la cual se permite el injunction para evitar el cobro de un tributo es que el contribuyente demuestre:
(1) que la contribución es claramente ilegal (Fernández v. Buscaglia, Tes., 60 D.P.R. 596 (1942));
(2) que las leyes contributivas no le garantizan un reintegro adecuado de lo pagado si prevalece, y
(3) que, como en todo recurso de injunction, la imposición o el cobro del tributo le causarán daño irreparable. Cafeteros de P.R. v. Tesorero, supra, págs. 761—766.
Aun así, el Señor Juez Presidente arguye que esta ex-cepción ha sido criticada y es un acto de “legislación judicial”, la frase de moda. Contrario a lo que señala la Opinión disidente, lejos de criticar esa excepción, tanto el tratadista Rivé Rivera como la jurisprudencia de este Tribunal la han reconocido de manera reiterada y uniforme.
Respetuosamente entiendo que el Señor Juez Presidente se equivoca al querer encajar este caso dentro de un marco tan estrecho. No se trata de que la excepción sea contraria al texto de la ley. Es que la prohibición al pleito de injunction no aplica a este recurso.
Por definición, la prohibición al uso del injunction está dirigida al contribuyente afectado, es decir, a la persona que viene obligada a pagar el tributo. Esto es lógico, pues el contribuyente tiene disponibles otros mecanismos en ley para librarse del pago del tributo.
*290 A diferencia del contribuyente, la persona que no tiene que pagar el tributo, es decir, que no es el contribuyente, pero que se ve afectada colateralmente por la deficiencia contributiva, puede instar el recurso extraordinario de injunction para evitar los daños irreparables que le causa la imposición del arbitrio. No se puede alegar que esa persona tiene disponible el remedio de pagar bajo protesta y solicitar reintegro porque ese mecanismo “es aplicable únicamente a personas que están sujetas al pago de contribuciones según las leyes de Puerto Rico”. Durlach Bros., Inc. v. Domenech, Tes., 47 D.P.R. 654, 659 (1934).
En este caso, Yiyi Motors no tiene disponible el mecanismo de pago bajo protesta porque no es la persona jurídica que viene obligada a pagar la contribución adicional que impuso el Secretario de Hacienda. En otras palabras, “las contribuciones no son debidas por la peticionaria en este caso, sino por otra persona”. Id., pág. 657.
Esto no es una mera alegación de Yiyi Motors ni un invento de este Tribunal. Es el estado de derecho producto de la determinación del Tribunal de Primera Instancia de que el Secretario de Hacienda no le ha requerido a Yiyi Motors el pago del arbitrio adicional en controversia porque Yiyi Motors no es el obligado por ley a tributar. El Secretario no ha requerido ese pago porque sabe que, por ley, esa obligación es del traficante o importador de vehículos, que en este caso es Motorambar, Inc.
Quien único parece cuestionar esto en esta etapa del procedimiento judicial es la disidencia. El Secretario de Hacienda no ha impugnado, no ha cuestionado ni ha recurrido de esa determinación del foro primario. Además, el peticionario ante los foros apelativos ha sido Yiyi Motors. No nos corresponde asumir la postura que el Secretario de Hacienda declinó y abogar por lo que éste no implora. Hacerlo sería abrogarnos una facultad de la Rama Ejecutiva y convertimos en abogado de parte.
*291 Establecido en el expediente que Yiyi Motors no es el contribuyente y que no tiene a su disposición el mecanismo de pago bajo protesta, es claro que no le podemos dejar desprovista de remedio. La parte peticionaria, Yiyi Motors, no está evadiendo el pago de impuestos. Por el contrario, Yiyi Motors se encuentra —bajo el estado procesal vigente— a expensas de lo que decidan Motorambar, Inc. y el Departamento de Hacienda. Yiyi Motors no es parte en ese proceso de cobro —como dispuso el Tribunal de Primera Instancia— y, por lo tanto, no puede defender su posición en el foro administrativo ni en la revisión judicial de novo que la ley le provee al contribuyente. Mientras tanto, los vehículos que Yiyi Motors vendió se encuentran sin registrar en el Departamento Transportación y Obras Públicas. Eso no se corregirá hasta que el Secretario de Hacienda emita las certificaciones de pago de los arbitrios, lo que tampoco sucederá hasta que Motorambar, Inc. decida pa-gar o impugnar la imposición contributiva. Eso se repetirá cada vez que Yiyi Motors venda un automóvil y el Secretario de Hacienda notifique a Motorambar, Inc. una deficiencia contributiva. Mientras tanto, Yiyi Motors está vulnerable ante las posibles reclamaciones de los compradores, molestos porque no han logrado inscribir a su nombre el auto que Yiyi Motors les vendió. El único remedio que Yiyi Motors tiene para remediar esta encrucijada es el injunction.
Las opiniones disidentes no reconocen este problema y por eso no lo atienden. Se limitan a invocar la inaplicable prohibición al injunction del contribuyente. El Señor Juez Presidente invoca también el efecto que él cree que la Opinión del Tribunal puede tener sobre el erario. El problema con esa Opinión disidente, aparte de su incorrección en Derecho, es que si el problema se redujera a eso, bastaría con que Yiyi Motors pagara bajo protesta y pidiera reintegro si el Secretario de Hacienda le intentara cobrar una *292 contribución adicional por la diferencia entre el precio sugerido de venta y el precio real de venta de uno o más automóviles. Cuando eso sucediera y Yiyi Motors impugnara la contribución, tendríamos que resolver que ésta es ilegal. El efecto sobre las finanzas del Gobierno no sería entonces un argumento para resolver en contra de Yiyi Motors ni de ningún contribuyente a quien se le pretenda cobrar un arbitrio ilegal. Tampoco es buen argumento ahora.
Por esa razón me preocupa sobremanera que se diga que el Tribunal incurre en un “contrasentido” al resolver a favor de un contribuyente mientras “[e]stamos atravesando por una época de crisis fiscal sin precedentes, en la que los recursos del Estado son cada vez menos y, como resultado, se han realizado ajustes diversos y severos en el Gobierno”. Opinión disidente del Juez Presidente Señor Hernández Denton, a la cual se unió la Juez Asociada Señora Rodríguez Rodríguez, pág. 301.
Si el impacto económico fuera el criterio rector para decidir este recurso, cabría plantearse que la solución alcanzada ayuda a aliviar la crisis de la industria de ventas de automóviles en Puerto Rico, al eliminarle a los concesionarios la carga de un arbitrio adicional sobre el precio de los vehículos de motor que éstos apenas logran vender en medio de una recesión económica. Es conocido por todos que la industria de venta de autos se encuentra afectada por la recesión actual, al punto que el Gobierno federal se vio compelido a implantar por tiempo limitado un plan de incentivos monetarios para aumentar las anémicas ventas de automóviles en toda la Nación, incluso en Puerto Rico. En ese clima económico, la decisión de este Tribunal contribuye, por lo menos, a evitar que los concesionarios tengan que subir los precios de venta para pagar el arbitrio que hoy declaramos ilegal.
Como vemos, la moneda tiene dos caras. Por eso, el criterio para nuestra decisión no puede ser la crisis econó *293 mica actual. “ ‘No es atendible en este foro el argumento ... sobre el impacto oneroso que tiene el estatuto .... Nuestra función es interpretar la ley y no juzgar su bondad o sabiduría’.” Famania v. Corp. Azucarera de P.R., 113 D.P.R. 654, 657—658 (1982), citado en Mun. Trujillo Alto v. Cable TV, 132 D.P.R. 1008, 1019 (1993). No hay duda que al resolver, los jueces tenemos que sopesar las consecuencias de nuestras decisiones para las partes y la sociedad en general. “Como Jueces, debemos ser conscientes de que todas nuestras decisiones tienen consecuencias, no sólo para las partes, sino para la sociedad misma en la que nos desenvolvemos.” Pueblo v. Díaz De León, supra, pág. 966, opinión disidente del Juez Presidente Señor Hernández Denton, a la cual se unió la Jueza Asociada Señora Fiol Matta. Pero en todo caso, nuestras decisiones tienen que basarse en el Derecho aplicable y no en consideraciones ajenas al dictado de una conciencia independiente. Incluso, hemos de excluir hasta la posible apariencia de que nuestras actuaciones judiciales están influenciadas por el clamor público, o por consideraciones de popularidad o notoriedad. Canon 8 del Código de Ética Judicial, 4 L.P.R.A. Ap. IV-B. Es la Asamblea Legislativa “la que luego de considerar todos los factores envueltos incluyendo el impacto económico”, decidirá si enmienda o no la ley de arbitrios. Torres García v. F.S.E., 111 D.P.R. 469, 474 (1981), citado en Mun. Trujillo Alto v. Cable TV, supra, pág. 1019.
Por supuesto, somos conscientes de la magnitud de los problemas fiscales del Gobierno. Sin embargo, tenemos bien claro que la solución a la crisis fiscal no puede ser que el Gobierno cobre arbitrios contra la ley. Este Tribunal está para hacer justicia y procurar que todos cumplan la ley, incluso el Gobierno. Somos el más alto Tribunal para hacer justicia en esta jurisdicción y no una colecturía del Departamento de Hacienda.

 Talcott Inter-Amer. Corp. v. Registrador, 104 D.P.R. 254, 262-263 (1975).

 See. 2011 del Código de Rentas Internas, según enmendada, 13 L.P.R.A. seo. 9014.

 Apéndice de la Petición de certiorari, pág. 45.

 Sec. 2051(a)(1) del Código de Rentas Internas, supra, 13 L.P.R.A. sec. 9068(a)(1).

 Para el 27 de mayo de 2003, día en que presentó la demanda de injunction y un Memorando en apoyo a Solicitud de injunction, Yiyi Motors alegó tener pendiente de inscribir trescientos vehículos ya vendidos y cuentas por cobrar de instituciones financieras por $2,000,000.

 Apéndice de la Petición de certiorari, pág. 396.

 íd., pág. 397.

 En esta etapa apelativa, Motorambar nos solicita intervención en calidad de amigo de la corte; no obstante, por este medio, la declaramos “sin lugar” ya que no aduce nada que Yiyi Motors no haya argumentado en su comparecencia.

 Amieiro González v. Pinnacle Real Estate, 173 D.P.R. 363 (2008); Caribe Comms., Inc. v. P.R.T.Co., 157 D.P.R. 203, 211 (2002).

 Raimundi v. Productora, 162 D.P.R. 215, 225 (2004).

 Véase Caribe Comms., Inc. v. P.R.T.Co., supra, pág. 213.

 Amieiro González v. Pinnacle Real Estate, supra, pág. 983; Caribe Comms., Inc. v. P.R.T.Co., supra, págs. 213-214; Acevedo v. Mun. de Aguadilla, 153 D.P.R. 788, 810 (2001); Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 130 (1998).

 Alejandro Rivera v. E.L.A., 140 D.P.R. 538, 545 (1996); Raimundi v. Productora, supra, pág. 228.

 P.A.C. v. P.I.P., 169 D.P.R. 775 (2006); Ex parte Irizarry, 66 D.P.R. 672, 676 (1946).

 íd.

 P.A.C. v. P.I.P., supra, pág. 799.

 íd.

 31 L.P.R.A. sec. 14.

 Silva v. Adm. Sistemas de Retiro, 128 D.P.R. 256, 269 (1991). Véase Atiles, Admor. v. Comisión Industrial, 77 D.P.R. 16, 20 (1954).

 Irizarry v. J & J Cons. Prods. Co., Inc., 150 D.P.R. 155, 165 (2000).

 Silva v. Adm. Sistemas de Retiro, supra, pág. 269; Clínica Juliá v. Sec. de Hacienda, 76 D.P.R. 509, 520 (1954).

 Otero de Ramos v. Srio. de Hacienda, 156 D.P.R. 876, 883-884 (2002); Pueblo v. Zayas Rodríguez, 147 D.P.R. 530, 538 (1999); Vélez v. Srio. de Justicia, 115 D.P.R. 533, 544 (1984).

 Dorante v. Wrangler of P.R., 145 D.P.R. 408, 417 (1998).

 J.P. v. Frente Unido I, 165 D.P.R. 445, 472 (2005); Vázquez v. A.R.Pe., 128 D.P.R. 513, 523 (1991).

 R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, San Juan, Pubs. J.T.S., 1987, pág. 299.

 Talcott Inter-Amer. Corp. v. Registrador, supra, pág. 262.

 íd.

 Véase B.B.C. Realty v. Secretario Hacienda, 166 D.P.R. 498, 511 (2005).

 Bernier y Cuevas Segarra, op. cit., pág. 466.

 B.B.C. Realty v. Secretario Hacienda, supra, pág. 511; Central Coloso v. Descartes, Tes., 74 D.P.R. 481, 486 (1953); Plácido Longo & Cía. v. Sancho Bonet, Tes., 50 D.P.R. 160, 163 (1936).

 B.B.C. Realty v. Secretario Hacienda, supra, pág. 507, citando a Gould v. Gould, 245 U.S. 151, 153 (1917).

 Sec. 2001(a)(15)(A) del Código de Rentas Internas, 13 L.RR.A. see. 9001(a)(15)(A) (ed. 2001) (versión'enmendada en infra, n. 30). La única alteración que sufrió esta definición a raíz de la aprobación del Código de Rentas Internas fue la exclusión de la frase “los equipos instalados localmente”, como un elemento más a tenerse en cuenta al determinar el precio sugerido de venta al consumidor.

 Sec. 2001(a)(ll)(A) del Código de Rentas Internas, supra, según enmendada por el Art. 16 de la Ley de la Justicia Contributiva de 2006, Ley Núm. 117 de 4 de julio de 2006 (13 L.P.R.A. sec. 9001(a)(U)(A)).

 El sistema de peso y caballaje, que era el utilizado con anterioridad a la Ley Núm. 80 de 17 de octubre de 1992, se prestaba a interpretaciones ambiguas que redundaban en perjuicio del Estado y del consumidor.

 1992 (Parte 1) Leyes de Puerto Rico 388, 389-390.

 Sec. 2011(c)(1) y (2) del Código de Rentas Internas, 13 L.RR.A. see. 9014(e)(1) y (2). El inciso (1) fue enmendado por la Ley de la Justicia Contributiva de 2006 para excluir de esta disposición los vehículos de uso múltiple nuevos y usados. Art. 16 de la Ley de la Justicia Contributiva de 2006, supra. Además, cuando la última oración de esta sección dispone “sin menoscabo de las disposiciones establecidas en el Subtítulo F”, se refiere a la See. 6001 et seq. del Código de Rentas Internas, 13 L.RR.A. see. 8021 et seq.

 El término “sugerir” significa “\p\roponer o aconsejar algo”. Diccionario de la Lengua Española, 22da ed., Madrid, Ed. Espasa Calpe, 2001, T. II, pág. 2106.

 Diario de Sesiones de la Cámara de Representantes, 2 de octubre de 1992, págs. 54-55 y 59.

 Art. 2001—l(25)(i) del Reglamento 7437 de 14 de diciembre de 2007 (Reglamento 7437) (disposición similar al derogado Art. 3(14)(a) del Reglamento 5020).

 Art. 2011(a)-4, (a)(1), (a)(4), (d)(2)-(4) del Reglamento 7437, supra (disposiciones similares al derogado Art. 4(A)(1), (A)(4), (A)(5) del Reglamento 5020). Cabe destacar que el término “distribuidor” está definido como “aquel importador que tiene una relación de distribuidor exclusivo con el fabricante de vehículos de motor y que representa a dicho fabricante en Puerto Rico”. Art. 2011(b)-l(a)(5) del Reglamento 7437, supra (disposición similar al derogado Art. 3(9) del Reglamento 5020).

 Sec. 2011(c)(2) del Código de Rentas Internas, 13 L.P.R.A. sec. 9014(c)(2).

 íd.

 Art. 2001-l(a)(25)(i) del Reglamento 7437, supra.

 Sec. 2011(e)(2) del Código de Rentas Internas, supra.

 íd.

 Art. 2011(a)-4(d)(2) del Reglamento 7437.

 Sec. 2051(a)(1) del Código de Rentas Internas, supra.

 Cabe resaltar que la sustitución del criterio del legislador por parte del Secretario de Hacienda resulta ser particularmente conveniente para la agencia, pues mediante el procedimiento implantado no se reevalúa el precio sugerido de venta en aquellos casos en que el precio final de venta al consumidor es menor al precio sugerido de venta declarado por el importador, por lo que no se reintegra dinero al contribuyente a pesar de que se le cobró el arbitrio por una cantidad mayor al precio final de venta. Recordemos que mediante la definición reglamentaria de lo *266 que constituye el precio sugerido de venta, el Secretario se atribuyó la facultad de examinar “[t]oda declaración de venta en exceso del precio sugerido de venta al consumidor ... para determinar si el incremento está sujeto al pago de arbitrios adicionales”. (Énfasis suplido.) Art. 2001-l(a)(25)(i) del Reglamento 7437, supra.

 P.A.C. v. P.I.P., supra, pág. 799. Véase Ex parte Irizarry, supra, pág. 676.

 Sec. 2011(e)(2) del Código de Rentas Internas, supra.

 Sec. 6002 del Código de Rentas Internas, 13 L.P.R.A. sec. 8022.

 Sec. 2011(c)(2) del Código de Rentas Internas, supra.

 Sec. 2011(c)(4) del Código de Rentas Internas, 13 L.P.R.A. sec. 9014(c)(4).

 Art. 2011(c)(3)-5(a) del Reglamento 7437, supra (disposición similar al derogado Art. 9(6), Reglamento 5020).

 Sec. 2011(c)(9) del Código de Rentas Internas, supra.

 Café Rico, Inc. v. Mun. de Mayagüez, 155 D.P.R. 548, 552 (2001). Véase Art. VI, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1.

 Diario de Sesiones de la Cámara de Representantes, supra, pág. 55.

 P.A.C. v. P.I.P., supra, pág. 799; Ex parte Irizarry, supra, pág. 676.

 Es menester puntualizar que el hecho de que declaremos nulas estas disposiciones reglamentarias no implica que el Reglamento 7437 es nulo en su totalidad, pues en éste se incluyó una cláusula de separabilidad que dispone:
“... Si cualquier artículo, párrafo, inciso, cláusula, subcláusula o parte de este Reglamento fuese declarado inconstitucional o nulo por un tribunal con jurisdicción, la sentencia dictada a esos efectos no invalidará el resto de este Reglamento, quedando sus efectos limitados a[l] artículo, párrafo, inciso, cláusula, subcláusula o parte de este Reglamento que fuels] e declarado inconstitucional o nulo.” Reglamento 7437, supra, pág. 143.

 Sec. 2011(c)(1) del Código de Rentas Internas, supra, 13 L.RR.A. see. 9014(c)(1).

 Sec. 2011(c)(2) del Código de Rentas Internas, supra.

 Sec. 2011(c)(9) del Código de Rentas Internas, supra.

 Sec. 2068(a)(1) del Código de Rentas Internas, 13 L.P.R.A. sec. 9068(a)(1).

 Durlach Bros., Inc. v. Domenech, Tes., 47 D.P.R. 654, 659 (1934); 32 L.P.R.A. sec. 3524(7).

 Durlach Bros., Inc. v. Domenech, Tes., supra, págs. 658-659.

 íd., pág. 659.

 íd.

 Cafeteros de P.R. v. Tesorero, 74 D.P.R. 752, 766-767 (1953).

 íd., págs. 765-766.

 íd., págs. 766-767.

 íd., pág. 767.

 íd., pág. 764.

 32 L.P.R.A. sec. 3524(3).

 Ortega Cabrera v. Tribunal Superior, 101 D.P.R. 612, 619 (1973).

 Las Monjas Racing Corp. v. Com. Hípica, 67 D.P.R. 45, 55 (1947); Nieves v. López, Comisionado, 61 D.P.R. 269, 273 (1943).

 íd.; 32 L.P.R.A. sec. 3524(3).

 Las Monjas Racing Corp. v. Com. Hípica, supra, págs. 55-56.

 Ortega Cabrera v. Tribunal Superior, supra, pág. 618; Las Monjas Racing Corp. v. Com. Hípica, supra, págs. 55-56; Nieves v. López, Comisionado, supra, pág. 273.

 White Star Bus Line, Inc. v. Sánchez, 59 D.P.R. 748, 752 (1942), citando a American School of Magnetic Healing v. McAnnulty, 187 U.S. 94 (1902).

 Véase White Star Bus Line Inc. v. Sánchez, supra, pág. 753.

 Ortega Cabrera v. Tribunal Superior, supra, pág. 618.

 D. Rivé Rivera, Recursos Extraordinarios, 2da ed. rev., San Juan, Programa de Educación Jurídica Continua, Universidad Interamericana de Puerto Rico, 1996, pág. 31. En igual sentido, en Cruz v. Ortiz, 74 D.P.R. 321, 328 (1953), establecimos: “El concepto de evitación de daños irreparables ... constituye un aspecto de la regla básica de que procede un injunction cuando el remedio existente en el curso ordinario de la ley es inadecuado.”

 Es insostenible que las personas que compran los vehículos transcurrido el evento contributivo, y que claramente no tienen responsabilidad tributaria por su importación, queden desprovistos de un remedio hasta tanto el Secretario de Hacienda y el importador diluciden si se adeudan contribuciones de acuerdo con un sistema tributario ajeno al establecido en el Código de Rentas Internas, lo que a su vez los expone a que el importador concerniente —Motorambar en este caso— lo acepte y eventualmente emita el pago requerido.

 Opinión, disidente, pág. 294.

 íd., pág. 294; Pueblo v. Díaz, Bonano, 176 D.P.R. 601, 672 (2009), opinión disidente; Crespo Quiñones v. Santiago Velázquez, 176 D.P.R. 408 (2009), opinión disidente.

 Suárez Cáceres v. Com. Estatal Elecciones, 176 D.P.R. 31 (2009), opinión disidente.

 Suárez Cáceres v. Com. Estatal Elecciones, supra, pág. 107.

 Crespo Quiñones v. Santiago Velázquez, supra, págs. 420-421. Véase, además, Pueblo v. Díaz De León, 176 D.P.R. 930 (2009), opinión disidente.

 Pueblo v. Díaz De León, supra, pág. 950.

 Crespo Quiñones v. Santiago Velázquez, supra, pág. 424.

 Pueblo v. Díaz De León, pág. 948.

 Pueblo v. Díaz, Bonano, supra, pág. 656.

 íd., pág. 659.

 íd., pág. 663.

 íd., pág. 672.